**BROADCASTING RIGHTS INTERNATIONAL CORP., Plaintiff,**

v.

**SOCIETE du TOUR de FRANCE, S.A.R.L., Defendant.**

**No. 87 Civ. 7485 (RWS).**

United States District Court, S.D. New York.

Dec. 9, 1987.

Friedman, Wittenstein & Hochman, New York City, for plaintiff; Stuart I. Friedman, Andrew A. Wittenstein, David J. Nathan, Jody Kasten, of counsel.

Davis Polk & Wardwell, New York City, for defendant; James W.B. Benkard, Kathleen de Carbuccia, Lawrence Byrne, Molly Fields, Yael Spitzer, of counsel.

## OPINION

SWEET, District Judge.

Broadcasting Rights International Corp. ("BRIC") commenced this action seeking damages and injunctive relief from defendant Societe du Tour de France, S.A.R.L. ("STDF") arising out of STDF's alleged interference with BRIC's contract with CBS Sports ("CBS"). BRIC sought a temporary restraining order and a preliminary injunction, and STDF has moved for an order dismissing the complaint for lack of personal jurisdiction or on the ground of forum non conveniens. Argument was heard on November 25, 1987. Although personal jurisdiction exists over STDF, for the reasons set forth below, the complaint is dismissed conditionally on the ground of forum non conveniens.

### THE COMPLAINT

BRIC contends that STDF's wrongful conduct has destroyed its existing and prospective business relationships. Thus, in its complaint BRIC has asserted two primary claims against STDF: (1) a claim for tortious interference with contractual and pre-contractual relations and (2) a claim for declaratory judgment as to the enforceability and validity of its contracts with STDF.

### FACTS

BRIC is a Florida corporation whose three shareholders are French citizens and whose principal shareholder and president is Philippe Riquois. BRIC has no office, no telephone number and no employees in the state of New York. On his frequent business trips to New York, Riquois utilizes the offices of his attorneys here. BRIC also holds more than $2 million in two separate bank accounts in New York.

STDF is a company organized under French law that was created in 1973 to

organize and administer the Tour de France (the "Tour"), an internationally renowned bicycle race held each July in France. The sole shareholder of STDF is a French entity known as "Les Editions Amaury," a newspaper group that also owns *Le Parisien* and *L'Equipe*, two French newspapers that originally co-sponsored the Tour in 1902. The principal co-managers of STDF were Jacques Goddet and Felix Levitan, although it appears that beginning in 1981, Levitan took the lead role in managing the company. STDF has no office, no telephone number, no bank account, and no employees, agents or representatives in the state of New York.

This dispute arises from various contracts that Levitan and Riquois entered into on behalf of STDF and BRIC, respectively.

## THE RELATIONSHIP BETWEEN BRIC AND STDF

Despite its long history and international stature, the Tour, as recently as 1979, had only minimal media exposure in the United States and other countries outside Western Europe. In 1980, BRIC took its first steps to promote the Tour outside France, as a result of informal agreements which BRIC alleges it reached with STDF granting BRIC exclusive broadcast rights to the Tour, and with BRIC's assistance, in 1980 CBS broadcast five minutes of the Tour in the United States. In 1981 and 1982, NBC broadcast portions of the Tour using footage that BRIC had helped to obtain from a French television network. As evidence of its informal agreements with STDF, BRIC has submitted a document dated June 4, 1984 that is described as a rider ("1984 Rider Agreement") to a contract dated January 5, 1983 between BRIC and STDF.[1]

In 1983, CBS broadcast twenty-seven minutes of the Tour of America, a bicycle race in the United States that was sponsored by World Tour Cycling, a partnership that BRIC had formed with Capital Sports,

an American company specializing in the organization and marketing of athletic events. Although STDF declined BRIC's request that it provide financial support for the Tour of America, STDF did agree to provide technical assistance in return for payment of 120,000 French francs. When its partnership with Capital Sports dissolved, BRIC assumed responsibility for losses amounting to more than $500,000 that had resulted from the Tour of America.

The 1984 Rider Agreement reconfirms STDF's prior grant of "the exclusive rights to produce, transmit, negotiate and sell all the programs, films or broadcasts of its choice ... concerning the bicycle events organized by [STDF]" and extends those rights to "all the present and future events which [STDF] will organize or direct, directly or indirectly, in all countries of the world, whatever the sport concerned." The 1984 Rider Agreement also provides that prior to the annual payment of 70% of the broadcasting revenues to STDF, BRIC is authorized to deduct a total of $838,000 to cover losses and expenses it had accrued since 1979 in its efforts to promote the Tour and bicycle racing in the United States, in particular the 1983 Tour of America.

On April 7, 1985, BRIC entered into an agreement with CBS ("CBS Agreement") that granted CBS the American broadcast rights to the Tour and another bicycle race sponsored by STDF for the years 1985, 1986, 1987, and 1988 and obligated the parties to negotiate in good faith for extensions after 1988. BRIC asserts that it had obtained from STDF the exclusive rights to sell broadcast rights to the Tour in the series of informal agreements referred to above.

Finally, BRIC has submitted an agreement between BRIC and STDF dated July 4, 1985 ("Master Agreement") which sum-

---

1. BRIC has not produced a copy of the January 1983 Agreement, and STDF has represented that it cannot find such a document in its files. STDF has also raised the possibility that the 1984 Rider Agreement was back-dated to June 4, 1984 by pointing out that Articles 6 and 10 refer

expressly to an agreement dated April 7, 1985 between BRIC and CBS and expenses that BRIC incurred from August 1984 to April 1985 in negotiating that agreement. BRIC has not attempted to resolve this question concerning the dating of its Rider Agreement.

marizes the various formal and informal agreements that STDF had allegedly entered into with BRIC over the previous six years. The Master Agreement establishes BRIC's exclusive rights to sell the broadcast rights to the Tour for a five year period from June 4, 1984 to June 3, 1989.[2] This agreement reaffirms BRIC's right to deduct the lump sum payment that was provided in the 1984 Rider Agreement to cover past losses and expenses. BRIC contends that the Master Agreement, as extended, established its control over the worldwide broadcasting and trademark rights for the Tour and enabled it to renegotiate with CBS for an extension of the CBS Agreement.

### STDF'S INTERFERENCE WITH BRIC'S CONTRACTUAL RELATIONS

In March 1987, the board of directors of STDF fired Levitan after charging him with secretly contracting to permit STDF corporate funds to be used to cover BRIC's losses from the 1983 Tour of America. STDF claims that its officials, other than Levitan, discovered the existence of the Master Agreement for the first time in March when they obtained a court order permitting them to open and inspect Levitan's personal safe in his office. STDF claims that it then obtained a copy of the CBS Agreement from CBS Sports. STDF contends that Levitan sought to keep these two agreements secret from other officials of STDF and for that reason did not place copies of them in STDF's regular files.

On April 14, 1987, STDF informed Riquois by letter that STDF considered the agreements between STDF and BRIC to be "null and void," that it was thereby terminating those agreements, and that BRIC was no longer "qualified to claim to represent" STDF vis-a-vis other parties. On April 15, 1987, STDF sent identical letters to CBS and to Channel Four Television in London, England stating that BRIC was "no longer commissioned by [STDF] to represent it" and that STDF would nonetheless honor the rights that the networks had acquired pursuant to previous negotia-

tions with BRIC. On June 17, 1987, STDF filed a criminal complaint against Levitan and Riquois in a Paris court for misappropriation of company funds and restitution. The case is currently under investigation, and it does not appear that any criminal charges have been brought.

After April 1987, STDF dealt directly with CBS personnel in connection with the broadcast of the Tour. On August 5, 1987, STDF sent a telex ("August 5 Telex") to CBS reconfirming that Riquois's power to represent STDF had been cancelled and directing CBS to make all payments under the CBS Agreement directly to STDF. It appears that CBS had already paid $50,000 to BRIC but had not yet paid the $237,000 that remained due for the right to broadcast the 1987 Tour. STDF reiterated its request that CBS pay the balance due under the CBS Agreement directly to it in a telex dated August 24, 1987. However, following an exchange of telexes between CBS and STDF concerning the ongoing dispute between BRIC and STDF, STDF informed CBS in telexes dated September 8 and 23, 1987 that it should pay the $237,500 to BRIC, which CBS did by October 22, 1987.

Because of the dispute over whether BRIC possesses the right to sell the broadcast rights to the 1989 Tour, CBS has refused to enter into negotiations for the right to televise the race in 1989, although such negotiations are called for by the CBS Agreement and must be completed shortly in order to permit planning for the promotion of the 1989 Tour. STDF has indicated that CBS's rights to the 1988 Tour will be preserved. BRIC has retained all of the broadcast fees paid by CBS in 1987, and it remains unclear to whom the fees for the 1988 Tour will be paid.

### I. STDF's Motion to Dismiss

■ In a diversity action, the law of the state in which the district court sits governs personal jurisdiction over a nonresident defendant. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.

---

**2.** Two subsequent agreements dated December 2, 1986 ("Video–Tour Agreement") and December 4, 1986 ("Videocassette Agreement") extend the term of the Master Agreement to 1996.

1985). Therefore, it must first be determined whether section 301 or 302 of the New York Civil Practice Law and Rules (McKinney's 1972 & Supp.1987) ("CPLR") authorizes personal jurisdiction over STDF, a French company.

## A. CPLR § 301

Section 301 provides that "a court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." Under this section, a foreign corporation subjects itself to personal jurisdiction in New York with respect to any cause of action if it is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of [its] 'presence' in this jurisdiction." *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983) (*quoting Simonson v. International Bank*, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427, 429 (1964)). In applying the pragmatic test for section 301 jurisdiction, New York courts have focused on the following factors: "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Hoffritz for Cutlery*, 763 F.2d at 58. A foreign corporation is subject to jurisdiction in New York if it does business here "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917).

BRIC has failed to make even a prima facie showing that STDF is subject to jurisdiction under section 301. STDF, a French corporation with its principal place of business in France, has no office, no telephone number, no bank accounts, no assets, no employees, no personnel, and no representatives in New York. The fact that STDF authorized a major New York-based television network to broadcast the Tour and directly participated in and facilitated that broadcast by sending telexes and making telephone calls from France falls far short of establishing that STDF is *present* in New York within the meaning given to that concept by the "doing business" standard of section 301.

## B. CPLR § 302

### 1. Section 302(a)(1)

Section 302(a)(1) permits "a court [to] exercise personal jurisdiction over any nondomiciliary, ... who ... transacts any business within the state or contracts anywhere to supply goods or services in the state." Although a decision on jurisdiction must, of course, be particular to the facts of the individual case, *Beacon Enterprises*, 715 F.2d at 766, courts have articulated several basic principles that govern a determination under section 302(a)(1).

Jurisdiction exists under section 302(a)(1) if the "totality of the circumstances," *Sterling National Bank & Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870, 873 (2d Cir.1975), establishes that the defendant "purposefully availed himself of the privilege of conducting activities in New York State." *Current Textiles Corp. v. Ava Industries, Inc.*, 624 F.Supp. 819, 821 (S.D.N.Y.1985). "The showing necessary for a finding that defendant 'transacted business' ... is considerably less than that needed to establish defendant's 'doing business' ...." *Hoffritz for Cutlery*, 763 F.2d 55, 58 (2d Cir.1985). However, although physical presence is not a prerequisite to jurisdiction, *Parke–Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 508 (1970), the physical presence of the defendant in the forum state is a significant factor in determining personal jurisdiction under section 302(a)(1). *Metropolitan Air Service v. Penberthy Aircraft Leasing Co.*, 648 F.Supp. 1153 (S.D.N.Y. 1986); *see also* 1 Weinstein, Korn, Miller, New York Civil Practice ¶ 302.08 (1986) ("analysis of the cases reveals that with the possible exception of some early products liability cases ... the Court of Appeals has not upheld jurisdiction under the 'transaction of business within the state' test where neither the defendant nor his agent has been physically present in New York.").

Assuming arguendo that BRIC's causes of action arise out of the business transactions that BRIC seeks to locate in New York, BRIC has failed to show that STDF "transacted business" within New York. Although beginning in April 1987, STDF did communicate by telephone and telex with CBS in New York, "New York courts have consistently refused to sustain § 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York." *Beacon Enterprises*, 715 F.2d at 766. It is not disputed that STDF became an active participant with respect to the CBS Agreement after April 1987.[3] In that role, STDF communicated with CBS from France to reassure the latter of its rights under that agreement for the upcoming Tour, and even offered to indemnify CBS for any damages it might suffer as a result of legal action by BRIC. However, attempts to renegotiate or discuss differences under an existing contract, even when they take place in New York, do not constitute a "transaction of business" under section 302(a)(1). *CutCo Industries v. Naughton*, 806 F.2d 361, 368 (2d Cir.1986). Nor did STDF's communications with CBS establish a commercial relationship that was centered in New York. *Cf. Parke–Bernet Galleries*, 308 N.Y.S.2d at 340–41, 256 N.E. 2d at 508–509. Although no one from STDF journeyed to New York to meet with CBS, CBS personnel travelled regularly to France which was the exclusive locus of their business relationship.

BRIC places great weight on the fact that CBS's telecast of the 1987 Tour was an "extraordinarily complicated undertaking" that required the immediate and extensive participation of STDF. Without doubt, as the organizer of a 4,000 kilometer race that traverses France and touches its neighboring countries as well, STDF devotes considerable time and effort to ensure that all aspects of the race, from media coverage to sponsorships to the bicycle racing itself, proceed with as few obstructions as possible. Nonetheless, all of the actions that BRIC has shown STDF took to facilitate CBS's coverage of the race took place in France. These actions simply do not establish that STDF purposefully availed itself of the privilege of conducting activities within New York.

BRIC also contends that by signing the Master Agreement, STDF contracted "to supply goods or services in [New York]." CPLR § 302(a)(1); *see, e.g., Allen Lupton Assocs., Inc. v. Northeast Plastics, Inc.*, 105 A.D.2d 3, 482 N.Y.S.2d 647 (4th Dep't 1984); *Pyramid Co. of Ithaca v. The Original Great American Chocolate Chip Cookie Co.*, 102 Misc.2d 1056, 425 N.Y.S.2d 230 (Onondaga Cty. 1980). Thus, BRIC argues that STDF contracted to supply services—the provision of production and broadcasting rights to the Tour—in New York through an intermediary, namely BRIC.

The issue of whether the Master Agreement established BRIC as STDF's agent for the worldwide marketing of broadcast

---

**3.** In a telex to CBS dated August 5, 1987, STDF stated, "We confirm that all rights and obligations established by the April 7th 1985 Agreement remain binding for CBS and for our company, all payments to be made to us and not, I repeat not to BRIC." Paragraph 14 of the CBS Agreement states, "This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York." BRIC suggests that STDF's adoption of the CBS Agreement by telex alone is sufficient to prove that STDF was "doing business" in New York or, at the very least, that it was "transacting business in New York. BRIC's contention exaggerates the importance of the choice of law provision in the CBS Agreement for jurisdictional purposes. First, although Lev-

itan signed the CBS Agreement as a witness, STDF was not a party to the original agreement. Second, the August 5 telex merely reconfirmed the position STDF had taken in the form letter that it sent to both CBS and Channel Four Television in London on April 16, 1987 that STDF would not interfere with broadcast rights the networks might have acquired through BRIC. The August 5 telex is not sufficient to establish STDF's consent to jurisdiction in New York. *See Galgay v. Bulletin Co.*, 504 F.2d 1062, 1066 (2d Cir.1974) ("It is well-established that [a] choice of law provision does not have jurisdictional implications."); *cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481–82, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985) (choice of law clause a factor under "minimum contacts" analysis).

rights to the Tour need not be reached,[4] for BRIC has not shown how the broadcast rights to the Tour were "supplied" in New York. While the CBS Agreement did effect a transfer of broadcast rights from BRIC to CBS, the intangible services or goods at issue—the broadcast rights—were supplied in France where the object of those rights, the bicycle race, took place. CBS first took possession of and exercised those rights in France by taping the race. That the buyer of those rights is a New York company and that the telecast made possible by the acquisition of those rights was aired in New York and other states do not alter this conclusion, nor do the cases cited by BRIC. *See Allen Lupton Assocs.,* 482 N.Y.S.2d at 651 (upholding jurisdiction over defendant who shipped, under contract, 6000 plastic buttons to New York); *Pyramid Co. of Ithaca,* 425 N.Y.S.2d at 232 (jurisdiction over defendant who contracted to lease premises in New York for cookie business).

### 2. Section 302(a)(3)

■ Although New York has not extended the jurisdictional reach of its courts to the fullest extent possible under the federal constitution, *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), CPLR § 302(a)(3) casts a New York court's jurisdictional net far beyond the state's physical borders. Under section 302(a)(3)(ii), a court may exercise personal jurisdiction over any nondomiciliary who "commits a tortious act without the state causing injury to person or property within the state, ..., if he ... expects or should reasonably expect the act to have consequences in the state and derives substantial

revenue from interstate or international commerce." BRIC has established this court's personal jurisdiction over STDF under this section.[5]

The alleged tortious act—STDF's interference with BRIC's contractual relations with CBS—took place in France. The alleged injury occurred in New York which is home to CBS, the customer BRIC claims it has lost as a result of STDF's tortious interference. *Granada Television Int'l, Ltd. v. Lorindy Pictures Int'l, Inc.,* 606 F.Supp. 68, 72 (S.D.N.Y.1984); *Sybron Corp. v. Wetzel,* 46 N.Y.2d 197, 413 N.Y.S. 2d 127, 131, 385 N.E.2d 1055, 1058–1059 (1978). STDF's telexes to CBS in New York stating that BRIC was no longer qualified to sell broadcast rights to the Tour could reasonably be expected to have had consequences in New York. *Spectacular Promotions, Inc. v. Radio Station WING,* 272 F.Supp. 734, 737 (E.D.N.Y. 1967) ("The place where the plaintiff lost business would normally be a forum reasonably foreseeable by a tortfeasor.").

The sole remaining issue is whether STDF "derives substantial revenue from interstate or international commerce." The parties agree that in 1986, the year in which income to STDF from the United States was largest, STDF earned between 13% and 15% of its income from sources outside of France on total earnings of approximately $7 million.[6] Contrary to STDF's assertions, section 302(a)(3)(ii) does not require that the substantial revenue from international commerce be linked to New York or the United States. *Allen v. Auto Specialties Mfg. Co.,* 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3rd Dep't 1974). The statute does not, however, offer any

**4.** Although BRIC argues that acting as STDF's agent, it performed the service of providing broadcast rights in New York, the CBS Agreement was negotiated in France, Florida and New York. The fact that some of the negotiations for the CBS Agreement may have taken place in New York cannot support a finding that STDF contracted to supply services in New York.

**5.** Section 302(a)(3) also permits jurisdiction over a defendant who "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial reve-

nue from goods used or consumed or services rendered in the state." The above discussion has thoroughly addressed the absence of any conduct on the part of STDF that would place it within the scope of this provision. Therefore, only jurisdiction under the second prong of section 302(a)(3) will be considered.

**6.** BRIC has stated that according to public records, STDF had total revenues of 52,579,528 French francs of which 7,837,871 francs came from international commerce.

guidance as to what constitutes "substantial revenue."

In *Path Instruments Int'l Corp. v. Asahi Optical Co.*, 312 F.Supp. 805, 810 (S.D.N.Y.1970), the court stated:

> The "substantial revenue" provision of § 302(a)(3)(ii) is intended to extend the jurisdiction of New York courts to those defendants committing out-of-state tortious acts with repercussions in New York, who, because of the extent and non-local nature of their operations, can consistently with the requirements of fundamental fairness be expected to defend lawsuits in foreign forums. (citing McLaughlin, 1966 Supplementary Practice Commentary to CPLR § 302).

More recently, in *Trafalgar Capital Corp. v. Oil Producers Equip. Corp.*, 555 F.Supp. 305, 310–11 (S.D.N.Y.1983), the Honorable Edward N. Weinfeld held that the interpretation of "substantial revenue" is "dependent upon the overall nature of defendants' business, and ... 'connotes a course of earning ... as opposed to a single, albeit substantial, incident'." (quoting McLaughlin, Practice Commentaries to CPLR, 302:23 at 90 (1972)).

The Tour is an annual international event that requires continuous planning throughout the year. Thus, the income generated by STDF is not attributable to a "single, albeit substantial, incident." Moreover, it is fair to conclude that international revenues in excess of 10% on annual revenues in excess of $5 million constitute sufficient income from non-French sources to meet section 302(a)(3)(ii)'s jurisdictional requirement. Therefore, personal jurisdiction over STDF exists under section 302(a)(3)(ii).[7]

### C. Forum Non Conveniens

■ STDF's motion to dismiss the complaint on the ground of forum non conve-

niens must be considered in the light of the various private and public interest factors enumerated by the Supreme Court in *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 508–509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). Judge Weinfeld summarized those factors in *Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 509 (S.D.N.Y. 1982), as follows:

> The private interest factors include the location of evidence and witnesses, the availability of process to compel attendance of unwilling witnesses, as well as other practical problems that make trial of a case easy, expeditious, and inexpensive. The public interest factors include the difficulty which arises when a forum must apply foreign choice of law rules and foreign law, the administrative problems which follow when litigation is added to existing heavy caseloads in congested centers rather than being handled at its origin, and the imposition of jury duty upon a community which has no relation to the litigation.

The court must consider the enforceability of a possible judgment and the "relative advantages and obstacles to a fair trial." *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843. In addition, before granting a forum non conveniens dismissal, the court must ascertain the existence of an adequate, alternative forum. *Id.*, at 506–07, 67 S.Ct. at 842.

■ There is a strong presumption in favor of preserving plaintiff's choice of forum. Normally, unless the balance of private and public factors is strongly in favor of the defendant, "the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843. However, where the real party in interest is a foreigner and the plaintiff is a United States citizen solely by virtue of its place of incorporation, the plaintiff's choice of fo-

---

**7.** STDF contends that an assertion of personal jurisdiction over it would violate the requirements of due process of the Fourteenth Amendment to the United States Constitution. However, STDF's New York contacts that gave rise to the claim of tortious interference, although not sufficient to establish STDF's minimal commercial presence in New York, were purposefully directed toward New York and their probable effects here could easily have been foreseen. Thus, STDF's contacts with New York as they relate to the alleged tort satisfy the "minimum contacts" standards that this Circuit set forth in *Texas Trading & Milling Corporation v. Federal Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

rum will carry considerably less weight. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–56, 102 S.Ct. 252, 265–66, 70 L.Ed.2d 419 (1981); *Koster v. Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 527, 528, 67 S.Ct. 828, 833, 833–34, 91 L.Ed. 1067 (1947).

### 1. Private Interest Factors

■ BRIC contends that the only private interest at issue in this action is the relative ease of access to sources of proof of each party. BRIC is a Florida corporation whose shareholders, officers and regular employees are citizens and residents of France. Correspondence in the record from its president, Riquois, lists a Paris address and telephone number for the company. On September 21, 1987, BRIC became authorized to do business in New York, although it does not yet have an office or telephone number here. BRIC maintains two bank accounts in New York, where its sole client, CBS, is located. Thus, it is not apparent from the record that New York is, as BRIC asserts, the company's principal place of business. Riquois's willingness to travel and to transport BRIC's corporate documents thousands of miles to litigate this dispute does not, of course, establish that a New York forum provides greater ease of access to proof.

BRIC's claims arise from its rights under two agreements, the Master Agreement between it and STDF and the CBS Agreement between it and CBS. Since the loss of CBS as its major client is the focus of BRIC's tortious interference claim, BRIC argues that the presence of CBS personnel and documents in New York compels a finding that Paris would be an inconvenient forum in which to prove its claim. However, the record already contains the depositions of CBS personnel taken in connection with BRIC's application for preliminary injunctive relief. The depositions set forth the testimony of those who were involved in negotiating the CBS Agreement. BRIC has also obtained from CBS documents pertaining to that agreement and describing CBS's association with STDF during the spring and summer of 1987. On the other hand, all of the STDF officers and employees who participated in the alleged interference with BRIC's relationship with CBS are in France, as is any evidence in the possession of STDF that might document the alleged interference.

For its part, STDF contends that all of the sources of proof pertinent to the question of the validity and enforceability under French law of the Master Agreement are located in France. STDF asserts that Levitan is the most crucial source of proof for its claims that the Master Agreement is null and void and that Riquois was aware of Levitan's lack of authority to enter into such an agreement on behalf of STDF. This court does not have the authority to compel the appearance of Levitan, and BRIC concedes that his testimony would have to be obtained through the procedures established by the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, which is not a factor that would expedite the resolution of this action in New York. Finally, any judgment for damages that BRIC might be awarded on its tort claim against STDF could not be enforced in New York where STDF has no assets.

In sum, the only connection this litigation has with New York of any significance is the presence of CBS. Although a factor to be considered, the residence of an important non-party alone does not preclude a dismissal on the ground of forum non conveniens when the other private interest factors weigh substantially, as they do here, in favor of dismissal.

### 2. Public Interest Factors

Among the public interest factors that the Supreme Court in *Gulf Oil* identified as material to the forum non conveniens analysis is the need to apply foreign law. Both parties agree that the determination of BRIC's rights under the Master Agreement will be made according to French law. However, BRIC seeks to minimize the significance of this fact by arguing that the only legal issue involved is whether Levitan, as a co-manager of STDF, had the actual authority to enter into the various

agreements with BRIC. In addition to the scope of Levitan's authority to sign the various agreements with BRIC, however, are substantial questions of French law concerning the defenses raised by STDF. First, STDF contends that at a meeting of the board of directors of STDF in 1981, the board expressly resolved that Levitan did not have the authority to commit STDF to any financial support for the efforts of BRIC in promoting bicycling in America. Second, STDF asserts that Riquois had knowledge of Levitan's lack of authority in this regard but that he proceeded in 1984, 1985 and 1986 to enter into agreements designed to accomplish precisely what the board of STDF had prohibited. STDF's burden of proof as to these defenses and the substantive effect thereof are matters that will require the interpretation and application of French law.

BRIC has assumed that New York law will govern its claim for tortious interference with contractual relations. To support its assumption, BRIC relies on Paragraph 14 of the CBS Agreement which provides that "the interpretation and legal effect of this Agreement shall be governed by the law of the State of New York." Although there is no dispute that such a choice of law clause would be controlling in a contract dispute between CBS and BRIC, BRIC has offered no authority for the proposition that a choice of law clause in a contract that has been tortiously interfered with controls the choice of law question in a tort claim brought against the offending third party. No authorities have been cited on the choice of law issue with respect to BRIC's tort claim, and a question remains under New York choice of law rules as to whether New York law would govern a claim based on tortious interference in France by a French corporate defendant that injures a French-owned Florida corporate plaintiff in New York. *See Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S. 743, 191 N.E.2d 279 (1963).

In sum, BRIC has not demonstrated that New York law will govern any of the issues raised in this litigation. Although "the need to apply foreign law is not in itself a reason to apply the doctrine of *forum non conveniens*," *Olympic Corporation v. Societe Generale*, 462 F.2d 376, 379 (2d Cir.1972), the myriad French connections present in this case underscore the simple truth that "French law ... is much more sensibly and ably applied by the French judiciary than by this court." *Nipuna Devi Dasi v. Air–India*, No. 79 Civ. 4898, slip op. at 6 (S.D.N.Y. Jan. 26, 1986).

The respective interests of New York and France in the instant litigation also weigh in favor of dismissal of the complaint. Despite BRIC's attempts to place CBS and the American broadcasting industry at the hub of its dispute with STDF, the fact remains that the basis of this lawsuit is the Master Agreement which was negotiated and executed in France by two French citizens. The Master Agreement is written in French and calls for the application of French law. All of the witnesses to this agreement, if any, and all documents pertaining to this agreement are located in France. Moreover, the STDF personnel who terminated the Master Agreement and all documents pertaining to that event are located in France. More important, the interest of France in providing a forum for the resolution of a public controversy concerning the direction of a source of national pride like the Tour de France dwarfs the interest generated in New York by the prospect of the broadcast of the Tour by a network located in New York. Indeed, if television coverage by American networks became the criterion for ascertaining the appropriate forum for legal disputes, New York would become home to lawsuits having no connection to New York beyond their connection with televised public events.

While the plaintiff's choice of forum is significant, it is not controlling, even in this district where busy judges are said to be tempted to dispose of international litigation by granting dismissals on the grounds of *forum non conveniens, Calavo Growers of California v. Belgium*, 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring). Here the facts are such that the motion is granted, not on the basis of the temptation to avoid a difficult task, but in order to

produce a just result and to determine the appropriate forum for the resolution of the dispute between the parties.

### 3. Availability of an Alternate Forum

Both parties are subject to jurisdiction in France. The question then arises whether France is an adequate, alternate forum for this dispute. As discussed above, on June 17, 1987, BRIC filed a criminal complaint in a French court which is the subject of a pending investigation in France. A French lawyer for BRIC has submitted an affidavit which states that the pendency of such a criminal complaint could suspend any civil proceeding commenced by BRIC if such a stay were requested by STDF. Based on this representation, BRIC asserts that France is not an adequate, alternate forum for its lawsuit against STDF.

In response, French counsel for STDF has stated that BRIC may apply to a French court for interim injunctive relief pending a decision on a criminal complaint. The availability of interim injunctive relief notwithstanding, it appears that the adequacy of BRIC's French remedies turns, in part, on STDF's willingness to waive its right to apply for a stay in the event that BRIC commences a civil proceeding in a French court. A requirement that STDF waive its right to suspend any civil proceedings brought by BRIC in a French court will ensure the adequacy of the alternate forum. *See Calavo Growers of California,* 632 F.2d at 968.

BRIC has already obtained evidence from the CBS witnesses relative to its claim against STDF, and as a condition of any transfer STDF must waive any objections to the use of such evidence.

In view of the conclusions just set forth, it is not appropriate to determine the issues raised by BRIC's motion for a preliminary injunction which is therefore denied without prejudice to renewal if the conditions set forth below are not met.

Accordingly, based on the foregoing findings that the balance of both private and public interest factors establishes that France is far more intimately concerned with the issues raised in this litigation than New York, the complaint is dismissed on the ground of forum non conveniens subject to the willingness of STDF to waive its rights to stay or suspend any civil proceeding that BRIC may commence in a French court and to object to the use of evidence already obtained by BRIC.

Submit judgment on notice.