SARATOGA HARNESS RACING
INC., Plaintiff,

v.

Peter VENEGLIA, Individually and as Chairman of United Standardbred Horsemen of New York; Northeastern Harness Horsemen's Assoc. Inc.; Joseph A. Faraldo; Standardbred Owners Assoc. of New York; Leonard D. Powell; Standardbred Breeders and Owners Assoc. of New Jersey, Inc., Defendants.

94–CV–1400.

United States District Court,
N.D. New York.

Aug. 3, 1995.

Roemer, Featherstonhaugh Law Firm, E. Guy Roemer, Albany, NY, for plaintiff.

Whiteman, Osterman Law Firm, Neil L. Levine, Jonathan P. Nye, Albany, NY, for defendants Peter J. Veneglia, United Standardbred Horsemen of NY, NorthEast Harness Horseman's Assoc., Inc., Joseph A Faraldo, Standardbred Owners Assoc. of NY, Inc., Leonard D. Powell.

Sterns & Weinroth Law Firm, Michael S. Stein, Trenton, NJ, for defendants Standardbred Breeders & Owners Assoc. of New Jersey, Inc.

## MEMORANDUM DECISION & ORDER

McAVOY, Chief Judge.

ON January 27, 1995, oral argument was heard on plaintiff's motion for a preliminary injunction and defendants' motions under Fed.R.Civ.P. 12. In a decision delivered from the bench on that date the Court denied plaintiff's motion for a preliminary injunction, denied the rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction of all defendants but Standardbred Breeders & Owners Association of New Jersey, and denied the rule 12(b)(2) motion to dismiss for lack of personal jurisdiction of Standardbred Breeders & Owners Association of New Jersey ("SBOA–NJ"). Comes now SBOA–NJ seeking reconsideration of their motion to dismiss for lack of personal jurisdiction.

## I. BACKGROUND.

### A. Facts:

This action stems from failed contract negotiations between plaintiff **Saratoga Harness Racing, Inc.,** which operates a harness race track at Saratoga, New York, and the horse owners who race at Saratoga. **Defendant Northeastern Harness Horsemen's Association, Inc. ("NHHA")** is the trade organization of horsemen with which Saratoga previously had a contract relating to the terms and conditions of racing at Saratoga. That contract expired on November 30, 1993. **Defendant Powell** is a vice-president of **NHHA. Defendants Faraldo and Veneglia** are styled as members, agents and negotiators for **defendant NHHA.** Defendant Faraldo is also president of **defendant Standardbred Owners Association of New York, Inc. ("SBOA–NY"),** which represents horsemen at Yonkers racetrack. Defendant Veneglia is also an officer and member of **defendant United Standardbred Horsemen of New York ("USH")** an unincorporated group of horsemen's associations. Negotiations for a new contract between plaintiff and **NHHA** took place during the fall of 1993 and the Spring of 1994: those negotiations ultimately failed.

Plaintiff essentially states two separate antitrust claims against these defendants[1] based on their conduct during and since the time that negotiations broke down between plaintiff and the NHHA: 1) that defendant NHHA, through defendants Faraldo, Powell, and Veneglia both individually and through defendant USH, have organized a boycott of Saratoga by their membership and other horsemen, in violation of § 1 of the Sherman Act; and, 2) that these defendants and local horsemen's associations at other tracks have engaged in an illegal "tying" operation, whereby these local associations, in combination with other defendants, threatened to withhold their consent to simulcasting of those other tracks' races if those other tracks simulcasted races to Saratoga.

One of the reasons such concerted undertakings by horsemen's associations are theoretically possible is because under the Interstate Horseracing Act of 1978, 15 U.S.C. § 3001 *et seq.,* local horsemen's associations are guaranteed a power of consent to interstate simulcasting: that act says that consent of the "host-racing association" (the live-racing track) to interstate simulcasting is valid only if that track has a *written* agreement with its local horsemen's association, setting forth the terms and conditions of interstate wagering (including simulcasting). The Interstate Horseracing Act gives local horse-

---

1. Plaintiff also asserts violations of New York State antitrust law, N.Y.G.B.L. § 340, (the "Donnelly Act"), and a common law claim for tortious interference with contract.

men's associations a power of consent meant to be "withdrawn or varied only within the regular contractual process of negotiating an agreement as to terms and conditions between the horsemen's group and the host racing association." *See Alabama Sportservice, Inc. v. National Horsemen's Benevolent & Protective Ass'n,* 767 F.Supp. 1573, 1579 (M.D.Fla.1991). "It is the legislative intent of [the act] that [horsemen's associations] give consent in exchange for acceptable 'terms and conditions'—agreements as to money and exclusivity." *Id.* In short, the act provides consent powers to be negotiated with reference to the contractual relationship between the host racing association and the local horsemen's association.

Concerning SBOA–NJ, plaintiff alleges that the various defendants caused defendant SBOA–NJ to wrongfully withhold their consent to the simulcasting to Saratoga of harness racing from Meadowlands, Garden State Park and Freehold Raceway, SBOA–NJ's host racing associations' racetracks, whereby Saratoga was deprived of simulcasts from these tracks.[2]

## B. Procedural History:

SBOA–NJ previously claimed that this court lacked the requisite personal jurisdiction over them to adjudicate plaintiff's claims. Plaintiff claimed that long-arm personal jurisdiction was proper under N.Y.Civ.Prac.L. & R. § 302(a)(1) ("contracts anywhere to supply goods or services in the state"), and § 302(a)(3) ("commits a tortious act without the state causing injury to person or property within the state"), under both subdivisions (i) and (ii) of that section.

The Court concluded, construing plaintiff's jurisdictional allegations in the light most favorable to them, that plaintiff had met its *prima facie* burden of demonstrating that jurisdiction over these defendants was proper under 302(a)(1). The Court found that SBOA–NJ, as the representative body of its horsemen membership, had contracted with its host racing associations to supply services into New York. As part of that conclusion, the Court found that the supplying of simulcasting into New York for purposes of interstate wagering constituted the provision of services into New York within the meaning of § 302(a)(1). The Court also concluded that, as agents and negotiators of the horsemen, SBOA–NJ had agreed to provide its members' services for, and its own negotiated consent to, both the simulcasting of racing in New York and the acceptance of wagers from New York. As such, the Court found that SBOA–NJ's negotiated written consent constituted a contract to provide services into New York.

## II. DISCUSSION.

Defendant SBOA–NJ now seeks the Court's reconsideration of its decision that it properly had personal jurisdiction over them under New York's long-arm statute.[3]

### A. Standard for Reconsideration:

■ A court is justified in reconsidering its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent obvious

2. Further tying allegations through which plaintiff implicates the horsemen's associations' consent power, allegedly exercised in violation of antitrust include: **1)** that the **SBOA–NY** threatened management at Yonkers raceway that they would withdraw their consent to interstate simulcasting from Yonkers if Yonkers proceeded to simulcast in-state to Saratoga. Saratoga is now unable to receive simulcasts from Yonkers; and **2)** that defendants caused the horsemen's association at Vernon Downs to exercise a contractual provision to withhold their consent to simulcasting of Vernon's races to Saratoga.

3. SBOA–NJ offers no basis for the Court to reconsider its earlier determination that assertion

of personal jurisdiction over these defendants would not offend due process. *See Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 104–105, 108 S.Ct. 404, 409–410, 98 L.Ed.2d 415 (1987); *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991) (Where the underlying action is based on a federal statute, in order to subject a non-domiciliary to jurisdiction federal courts must consider both the state statutory basis for jurisdiction and whether application of that statutory jurisdiction comports with the due process clause of the Fourteenth Amendment).

injustice. *Larsen v. Ortega*, 816 F.Supp. 97, 114 (D.Conn.1992).

SBOA–NJ relies on the third, "clear error of law" ground in seeking reconsideration. "With regard to the third ground, the Court cautions that any litigant considering bringing a motion to reconsider based upon that ground should evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the Court and the litigant." *Atkins v. Marathon LeTourneau Co.*, 130 F.R.D. 625, 626 (S.D.Miss.1990). The motion for reconsideration is not a device "intended to give an unhappy litigant one additional chance to sway the judge." *Durkin v. Taylor*, 444 F.Supp. 879, 889 (E.D.Va.1977). It is in light of these considerations that the court undertakes reconsideration of its January 31, 1994 order.

## B. Defendants' Bases for Reconsideration:

■ For personal jurisdiction to lie in a New York court under § 302(a)(1), the non-domiciliary must have transacted business within New York State or contracted anywhere to supply goods or services in the state and the cause of action must arise out of such transaction. *Pellegrino v. Stratton Corp.*, 679 F.Supp. 1164, 1172 (N.D.N.Y. 1988).

SBOA–NJ offers three arguments why the Court erred in finding personal jurisdiction in the first instance: 1) that it never contractually consented to simulcasting its members' races; 2) that assuming *arguendo* it contracted with its host racing association to provide simulcasting into New York, simulcasting is not "supply[ing] goods or services in the state" within the meaning of § 302(a)(1); and 3) that irrespective of the Court's determination of the first two objections, plaintiff's claims did not "arise out of" the alleged contracts.

### i. No Contract, No Consent:

When it decided that SBOA–NJ had contracted to supply services in the state, the Court relied on plaintiff's uncontroverted allegations that SBOA–NJ had "agreed to provide simulcasts and accept wagers from off-track betting systems located in New York State." (Pltff. Memo in Opp. to Motion to Dismiss, at 4). *See Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990) ("[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction. At that preliminary stage, [then,] the plaintiff's *prima facie* showing may be established solely by *allegations*.") (emphasis added). While it is undisputed that by federal statute the host racing association (*i.e.* the simulcasting track) "must have a written agreement with the horsemen's group" representing the participants in the race which is to be subject to interstate wagering, *See* 15 U.S.C. § 3004(a)(1)(A),[4] on the original motion neither party placed the relevant statutorily required written agreement before the Court. Defendant SBOA–NJ now submits to the Court its written agreements with its host racing associations, and claims that these establish that it "never entered into a contract to supply simulcasting services into New York," (Deft.Memo for Recons. at 1). Upon examination of these artfully drafted agreements, however, the Court concludes that they in fact constitute contracts between the New Jersey host racing associations and SBOA–NJ to provide simulcasting services into New York.

The interstate simulcasting provision of these agreements reads in pertinent part as follows:

TWENTIETH: In the event that the Authority considers proposals for inter-track betting, ... the following provisions apply:

---

4. As the Sixth Circuit recently held, "One permissible interpretation of the Act suggests that a racetrack obtain the horsemen's consent during regular contract negotiations with the trade association that the horsemen choose to represent them; if a racetrack did not previously negotiate with a representative trade association, the racetrack would be required to obtain the consent directly from the owners." *Kentucky Division of the Horsemen's Benevolent Assoc. v. Turfway Park*, 20 F.3d 1406 (6th Cir.1994).

A. With regard to ... simulcasting, the Parties recognize the applicability of the Federal Interstate Horse Wagering Act, 15 U.S.C. § 3001 *et seq.* (the "Federal Act") and that the SBOA as the recognized representative of the harness horseman racing under the terms of this agreement, shall have all the rights permitted to horsemen's groups as defined in the Federal Act. The parties agree that the execution of the agreement is not to be construed as the SBOA's consent to the Authority's participation in any activities contemplated by the above-mentioned Federal Act.[5] If the Authority proposes to enter into Agreements with respect to interstate wagering ... the SBOA shall be notified of same and a copy of any such proposed agreement shall be submitted to the SBOA and shall not become effective unless the SBOA approves such agreement in writing within 21 days of its receipt. Such approval shall not be unreasonably withheld. In the event that the SBOA shall not have approved or disapproved said agreement within the 21–day period provided for herein, the proposed agreement for interstate ... wagering shall be deemed to have been approved as submitted by the Authority. (Stein Recons. Aff. Ex. A, B & C). This consent clause is followed by thirteen paragraphs of contractual provisions which are to explicitly control the implementation of simulcasting and interstate wagering and the disposition of revenues acquired from simulcasting and interstate wagering, once SBOA–NJ has consented to participate in such proposed simulcasting under this consent provision.

■ SBOA–NJ claims that the foregoing provision shows that they undeniably refused to provide negotiated written consent to simulcasting in New York. The Court finds, however, that this provision merely establishes the mechanism by which SBOA–NJ consents to participate in the proposed simulcasting agreements forwarded to them under this agreement—either by expressly responding to the submitted proposal or by failing to respond within twenty-one days. Having approved and consented to various proposed New York simulcasting agreements [6] (expressly or by silence), and thereby subjected such simulcasting to the previously negotiated terms and conditions contained in their agreements with their host racing associations, the Court finds that SBOA–NJ has contracted with the relevant New Jersey racetracks to participate in providing simulcasting into New York according to the detailed terms of the parties agreements.[7]

### ii. No Goods or Services:

SBOA–NJ also argues on reconsideration that, even assuming their agreements with their host racing associations constitute contracts to provide simulcasting to New York State, providing simulcasting is not "supply[ing] goods or services in the state" within the meaning of § 302(a)(1). The Court adheres to its earlier conclusion that by contractually participating in simulcasting into New York these defendants have supplied a service in New York.

SBOA–NJ points to *Broadcasting Rights International Corp. v. Societe du Tour de France, S.A.R.L.*, 675 F.Supp. 1439 (S.D.N.Y.

---

**5.** Defendant places particular emphasis on this sentence as evidence that it never contractually negotiated for or consented to simulcasting. In the Court's, view, however, this sentence simply establishes that execution of the *instant* agreement is not of itself consent to simulcasting: consent must be further sought and granted under the contractual consent terms which follow. Nothing in this sentence, however, precludes SBOA–NJ from exercising their power to consent in the future *under this contract.*

**6.** With Monticello Raceway, Vernon Downs, Yonkers Racetrack, Batavia Downs, Buffalo Raceway, and the Capital District and Nassau County OTBs, all in New York. (DeSantis Aff. Ex. A, B).

**7.** In a footnote SBOA–NJ argues that under the Court's analysis, by entering into contracts with New Jersey racetracks wherein they do *not* consent to interstate simulcasting, they could be found to have contracted to provide simulcasting services in each of the 50 states. Of course this does not follow: it is only where SBOA–NJ consents to simulcasting into a state according to their own contractual consent provision, and participates in that simulcasting and the proceeds therefrom under the negotiated explicit terms of their contract with the New Jersey race tracks, that they can be found to have contracted to provide simulcasting services for that state's jurisdictional purposes.

1987), for the proposition that broadcasting signals are supplied in the state where an event occurs, not the state to which a signal is transmitted. The Court finds that not only does that case not stand for that proposition, it is in any event not on all fours with this case. Initially, *Broadcasting Rights* is concerned far more with broadcasting *rights* than broadcasting *signals*. *Cf. CBS, Inc. v. Snyder,* 798 F.Supp. 1019, 1028 (S.D.N.Y. 1992) (allegation that TV station supplies television broadcast segments into New York insufficient for § 302(a)(1) where claims against station are not closely related to station's broadcast segments), *aff'd,* 989 F.2d 89 (2d Cir.1993). The contract offered in support of jurisdiction in *Broadcasting Rights* concerned the one time sale of all broadcast rights to the *Tour de France* by the sponsoring group, to a middleman who later sold those rights to a New York broadcasting entity. There is no indication in that case, however, that the *Tour* sponsor had any notice of, or contractual consent power over, the locations to which the middleman would later provide the *Tour de France* for future broadcast. Thereafter, the New York broadcasting entity "first took possession of and exercised those rights in France by taping the race." *Broadcasting Rights* 675 F.Supp. at 1445.

■ Simulcasting, however, has little in common with the one-time taping for future exhibition of a single event for entertainment or informational purposes. Rather, together with their host racing associations, these defendants instantaneously provide the New York receiving track with a live, ongoing sporting exhibition which is in turn "resold" by the receiving track via track admission fees, and which is subject to lucrative wagering in both locations. Indeed the net result is that by an electronic medium, the horsemen's association provides the same services to the New York track that it provides to its host racing association.

Furthermore, by both the terms of its contract and by statute, SBOA–NJ directly and immediately profits from providing the receiving track with its members' services through its receipt of a portion of the races' handle. The Court notes also that simulcast-

ing involves extensive interaction between the broadcasting and receiving parties, including the contemporaneous exchange of betting information and wagering across state lines.

■ In short then, the Court finds that just as SBOA–NJ provides services to its host racing associations by negotiating on behalf of and ultimately providing its members as participants for harness races, so to by its contractual consent to, and participation in simulcasting (which provides those self-same services to the receiving tracks, albeit electronically), SBOA–NJ has contracted in New Jersey to provide services into New York.

### iii. Not Arising out of:

With respect to the requirement that the cause of action "arise out of" the defendants' transactions the Court adheres to its earlier conclusion that plaintiff's allegations that SBOA–NJ, by combining and conspiring in violation of antitrust to withhold simulcasting to plaintiff while contractually providing simulcasting and interstate wagering to other New York venues, satisfies the articulable nexus requirement. *Pellegrino,* 679 F.Supp. at 1172 ("[t]he New York Court of Appeals has stated that "there must be some 'articulable nexus between the business transacted and the cause of action sued upon.'") (quoting *McGowan v. Smith,* 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981)).

■ Plaintiff here has alleged that SBOA–NJ has wrongfully withheld their consent, which power they possess both by statute and under their contract with their host racing association as discussed *supra.* The Court stresses again that it is not defendant's statutorily empowered denial of consent alone which gives rise to personal jurisdiction. Rather, it is the alleged wrongful denial of consent, under the terms of the selfsame contract by which SBOA–NJ has otherwise agreed to reap the benefits of providing their services to other New York race-tracks, which satisfies the requirements of New York's long-arm statute.

## III. CONCLUSION.

Having considered defendant SBOA–NJ's arguments in support of reconsideration and modification of The Court's earlier determination that plaintiff had properly asserted personal jurisdiction over SBOA–NJ, for all the foregoing reasons the Court declines to modify its earlier determination that jurisdiction is proper under N.Y.Civ.Prac.L. & R. § 302(a)(1).[8] Therefore, the relief sought by Standardbred Breeders & Owners Association of New Jersey is hereby **DENIED.**

**IT IS SO ORDERED.**

---

8. Although the Court did not reach the question in its original decision from the bench, upon review of the briefing and filings on the original motion as well as plaintiff's response to the motion for reconsideration, the Court has little doubt that personal jurisdiction is likewise proper under N.Y.Civ.Prac.L. & R. § 302(a)(3)(ii), under an analysis similar to that conducted in *Broadcasting Rights* 675 F.Supp. at 1445–46. *See Daniel v. American Bd. of Emergency Medicine,* 802 F.Supp. 912, 919 (W.D.N.Y.1992) ("An action alleging violations of antitrust laws is a claim for injuries sustained, and therefore is in the nature of a tort and long-arm jurisdiction would apply."); *Harrison Conference Services, Inc. v. Dolce Conference Services, Inc.,* 768 F.Supp. 405, 407 (E.D.N.Y.1991) ("If defendants improperly use the trade secrets to take New York customers from plaintiff, defendants will cause an injury within New York"); *see also* Roemer Aff. in Opp. to Dismissal, Desantis Aff. in Opp. to Recons. (discussing defendants income from interstate commerce); SBOA–NJ Reply Memo in Support of Dismissal, at 2 ("Admittedly, by operation of statute, SBOA–NJ does receive 3.5% of the retained handle from the New Jersey racetracks, some of which handle comes from interstate simulcasting.").