OPINION OF THE COURT
Chief Judge Breitel.
Plaintiff Sybron, among other things a manufacturer and reliner of glass-lined vessels used in processing corrosive chemicals, sues its former employee, Wetzel, and a competitor corporation, De Dietrich, to enjoin the employment of Wetzel by De Dietrich and to prevent Wetzel from divulging alleged trade secrets. Special Term after a hearing granted Sybron a preliminary injunction. The Appellate Division, in reversing, held De Dietrich not subject to personal jurisdiction, but reached the merits with respect to Wetzel, and dismissed the action as to both defendants. Plaintiff appeals.
The principal controversy involves application to De Dietrich of CPLR 302 (subd [a], par 3), providing long-arm jurisdiction over nondomiciliary defendants who commit tortious acts outside the State causing injury in New York. At issue is whether, for purposes of the statute, a nondomiciliary competitor causes injury in New York when it hires a former employee of a corporation engaged in manufacture in this State allegedly to obtain protected trade secrets. As to defendant Wetzel, dismissal of the complaint, which had not as yet been served, is challenged as premature.
The order of the Appellate Division insofar as it dis *201 missed the action should be reversed and the action reinstated as to both defendants. With respect to the Appellate Division’s reversal of the preliminary injunction this court is without power to review, and, therefore, to that extent the order of the Appellate Division should be affirmed.
Plaintiff, who had employed Wetzel at its New York plant for 34 years, would indeed be injured in New York should De Dietrich, by inducing a tortious breach of Wetzel’s obligations to his former employer and through use of trade secrets purloined through Wetzel, make valuable competitive sales to plaintiff’s New York customers. Plaintiff is thus entitled to invoke the jurisdictional statute to avert threatened harm. With respect to defendant Wetzel, dismissal of the complaint not yet served was premature, but denial of the preliminary injunction, as noted, is beyond the court’s scope of review. An issue not resolvable at this stage of the action, however, remains: the record, even on the limited evidence submitted or allowed upon the hearing for a preliminary injunction, raises the issue of fact whether Wetzel, applying his knowledge for the benefit of De Dietrich, would necessarily be divulging plaintiff’s trade secrets.
Wetzel had been employed in New York by the Pfaudler Company, a division of plaintiff Sybron, and one of three competitors in the United States engaged in the design, manufacture, and sale of glass-lined chemical processing vessels. Wetzel was involved in the preparation, coating, and firing of the glass used to line and reline the vessels. Despite his lack of formal education, he rose over the 34 years of his employment from helper in the coating department to general ceramics foreman. In 1974, however, at age 55, Wetzel took early retirement on reduced pension and moved to Florida.
In early 1977, defendant De Dietrich (USA), an American subsidiary of the French De Dietrich & Cie, advertised the installation in Union, New Jersey, of a new furnace for reglassing reactors and tanks. As a principal competitor of Sybron, De Dietrich has reglassed some 4,500 of Sybron’s "Pfaudler” vessels in its French plants, and intends for its New Jersey plant to reglass Sybron equipment.
This action was started after Sybron learned that De Dietrich’s American manager of manufacturing, a former chief ceramist at the Pfaudler division for whom Wetzel worked for many years, approached Wetzel in Florida and asked him to supervise the New Jersey facility. Evidently, only one other *202 person, also a former Pfaudler employee, was interviewed for the position.
Plaintiff, regarding the methods, processes, and techniques employed in its glassing operations as proprietary secrets, seeks to bar Wetzel from working for De Dietrich in its American plant and from divulging protected trade secrets. Also relied upon is a certain Patent and Trade Secret Agreement signed by Wetzel after he became a line foreman in 1961. According to plaintiff, each employee with access to proprietary secrets is required to agree that he "will preserve in confidence, and in accordance with established Company policy, all secret and confidential matters of the Company and others with whom the Company may have confidential relations both during [his] employment and thereafter.” Defendants deny that Wetzel possesses trade secrets or confidential information, and insist that his new position will entail only application of De Dietrich processes and techniques.
Following plaintiff’s motion for a preliminary injunction, a two-day hearing was conducted. Plaintiff conceded that Wetzel was not involved in laboratory development of new glass formulas. Emphasized, however, was his extensive experience and responsibility in the glassing and reglassing of "Pfaudler” vessels. Even after his retirement, Wetzel was sent by Sybron as a technical consultant to its Mexican division. There was testimony that De Dietrich, like Sybron, regards its glass lining techniques, and not only its glass formulas, as proprietary secrets. Wetzel, on the other hand, testified that he took no Sybron files with him, that he was not consulted with respect to the composition or preparation of the glass, and that his job at Sybron was merely to carry out procedures established by others. If he detected flaws, Wetzel would simply inform his superiors. In addition, defendants introduced testimony that Sybron had conducted tours of its plant for nonemployee engineers.
Special Term, denying defendants’ motion to dismiss for lack of jurisdiction, enjoined both De Dietrich’s employment of Wetzel and the disclosure of trade secrets pending the action. The Appellate Division reversed, unanimously holding that De Dietrich was not subject to the personal jurisdiction of the court and that Wetzel, although subject to the court’s jurisdiction, did not possess trade secrets. Dismissal of the complaint, even though it had not as yet been served, was directed.
There is no disagreement in the court with the Appellate *203 Division and Special Term that Wetzel was subject to personal jurisdiction and that service upon him was sufficient. The jurisdictional issue disputed in the court involves De Dietrich. A Delaware corporation based in New Jersey, De Dietrich is not qualified to do business in New York and has no New York office or employees. Of the 20 to 40 New York customers it has had, only Eastman Kodak and perhaps another are substantial. Kodak is also a major customer of Sybron.
CPLR 302, the "long-arm statute”, did not always expressly provide for personal jurisdiction over those whose tortious acts outside the State cause injury in New York (see L 1962, ch 308). It was only in response to Feathers v McLucas (15 NY2d 443) that in 1966 such a provision was added (L 1966, ch 590; Memorandum of the Judicial Conference, 2 McKinney’s 1966 Sess Laws of NY, p 2911; Twelfth Ann Report of NY Judicial Conference, 1967, pp 339-344). In the Feathers case, the court held that CPLR 302 (subd [a], par 2), which covers one who commits a tortious act within the State, did not apply to a nondomiciliary who improperly manufactured a tank in Kansas, even though the tank exploded in New York (supra, pp 458-464).
The 1966 addition allows the court to exercise personal jurisdiction when a nondomiciliary
"3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
"(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
"(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce”.
The Appellate Division held the statute of no avail because no tortious act had as yet been committed. The dissenters would agree. True, the agreement signed by Wetzel does not prohibit employment with a competitor, and, thus far, the dissenters argue, all De Dietrich has done is to hire Wetzel. If Wetzel possesses trade secrets, however, and if De Dietrich by its hiring agreement with Wetzel intends to obtain them from him, a tortious act will have been committed. The probable inferences from the admitted and controverted facts indicate a *204 conscious plan to engage in unfair competition by misappropriation of Sybron’s trade secrets. Indeed, if that eventually be found to be true, a tortious act resulting in the breach by Wetzel of his contractual obligation to Sybron has occurred in New Jersey, although the consequential economic injury in this State is still only anticipated (cf. Mendel v Pittsburgh Plate Glass Co., 25 NY2d 340, 346-347 [dissenting opn], overruled Victorson v Bock Laundry Mach. Co., 37 NY2d 395, 400). For such an intentional tortious act a remedy would be available at law, as for most intentional torts, as completed torts, even if the damages are nominal or unascertainable (see Prosser, Torts [4th ed], pp 35, 66-67; cf. id., pp 762-763, 948).
It is not from the mere hiring of Wetzel that the inferences against De Dietrich are drawn. The record shows much more. De Dietrich’s president, for instance, testified that their own firing process was a proprietary secret. It is undisputed that a good portion of the equipment to be reglassed in New Jersey will be Sybron vessels. On any view of the evidence Wetzel was familiar with the process used by Sybron. That he may have been hired primarily with a view towards exploiting his experience for the benefit of De Dietrich, therefore, is a logical, if not necessary, inference.
. El] As a matter of policy, no improper restraint on employees is worked by treating as a tort the hiring of Wetzel with the intention to acquire the benefit of Sybron’s trade secrets. Injunctive relief is not now reinstated, nor, in deciding the threshold jurisdictional question, is it relevant. Should a preliminary injunction be reinstated or a permanent injunction granted, Sybron’s proof will have to be strong enough to justify this drastic remedy. That issue is not now before this court for review. The issue at this juncture is only whether the action should die.
There is another basis on which the exercise of jurisdiction may be sustained. As noted, the admitted and controverted facts give rise to the probable inference that there is a conscious plan to engage in unfair competition and misappropriation of trade secrets. That should be enough to justify application of CPLR 302 (subd [a], par 3). If a tort must already have been committed for jurisdiction to be available under the statute, then that section would never be usable by a plaintiff seeking anticipatory injunctive relief. Such a result is unacceptable.
The more difficult question is whether the out-of-State acts *205 ascribed to De Dietrich will result in injury in New York (see, generally, McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C302:20, pp 87-88). CPLR 302 (subd [a], par 3), as noted, was added after the Feathers case (15 NY2d 443, supra) to fill a statutory gap. Some contend, therefore, that it was not motivated with commercial torts in mind where the locus of injury is not as readily identifiable as it is in torts causing physical harm (see, e.g., Chemical Bank v World Hockey Assn., 403 F Supp 1374, 1379). And, indeed, in the legislative history of the 1966 addition there is no discussion of commercial cases (see Reese, A Study of CPLR 302 in Light of Recent Judicial Decisions, Eleventh Ann Report of NY Judicial Conference, 1966, pp 132-138; Twelfth Ann Report of NY Judicial Conference, 1967, pp 339-344).
It is equally significant, however, that nowhere in the pertinent studies or reports were commercial torts excluded. Most important, save for the exclusion of causes of action for defamation (a specific exclusion of a nonphysical harm), the statute, drafted by sophisticated experts, does not limit the kinds of tortious acts covered to personal injury, property damage, or other noncommercial torts. Under such circumstances the statute should be read with the breadth it easily carries, and the unqualified legislative enactment respected.
It has been said that remote injuries located in New York solely because of domicile or incorporation here do not satisfy CPLR 302 (subd [a], par 3) (see, e.g., American Eutectic Welding Alloys Sales Co. v Dytron Alloys Corp., 439 F2d 428, 433-435; Friedr. Zoellner [New York] Corp. v Tex Metals Co., 396 F2d 300, 303). Plaintiff’s case does not rest on so narrow a foundation nor does its case depend on whether unfair competition injures it in every State in which it does business. It is, however, critical that it is New York where plaintiff manufactures and relines glass-lined equipment and the alleged trade secrets were acquired, and the economic injury plaintiff seeks to avert stems from the threatened loss of important New York customers.
It also need not be decided whether the loss of a small New York account would suffice. From the hearing testimony it may be inferred that, should plaintiff’s alleged trade secrets be disclosed, business from New York sales could suffer significantly. It was shown, for instance, that De Dietrich sales persons have actively solicited Sybron’s Rochester neighbor, *206 the multinational Eastman Kodak Company, a major customer of Sybron. In fact, by September, 1977, Kodak ordered from De Dietrich two 500-gallon reactors.
American Eutectic Welding Alloys Sales Co. v Dytron Alloys Corp. (439 F2d 428, 432-435, supra [Feinberg, J.]) supports the analysis. It is true that no injury within New York was found in the American Eutectic case, but in rejecting jurisdiction the court stressed that the only customers wrongfully solicited by defendants were located outside New York. (Accord Spectacular Promotions v Radio Sta. WING, 272 F Supp 734, 737.)
That the extraterritorial conduct of De Dietrich produces injury in New York does not, however, end the matter. The drafters of paragraph 3 sought to insure its constitutionality by further requiring that the nonresident either have reason to foresee that its actions will produce forum consequences or have enough other "contacts” with the State so as to make the exercise of personal jurisdiction reasonable (Twelfth Ann Report of NY Judicial Conference, 1967, pp 342-343).
It is not disputed that De Dietrich derives substantial revenue from interstate or international commerce. What is questioned is whether the New Jersey based De Dietrich should expect the hiring of Wetzel from Florida to have consequences in New York. Given that Sybron manufactures the equipment in New York, that Wetzel worked at Sybron in New York for 34 years, and that Sybron customers in New York are being pursued, it is reasonable that De Dietrich foresee New York as the place injury will occur. Thus, the requirements of clause ii of paragraph 3 are also met, and De Dietrich should be subject to the personal jurisdiction of the court.
As noted earlier, this court may not review denial of the preliminary injunction as to Wetzel. Contrary to the holding at the Appellate Division, however, at this stage of the proceedings it cannot be concluded that Wetzel, with his intimate knowledge of plaintiffs glassing techniques, was not in possession of trade secrets. Comment on the merits, therefore, is required.
The project engineer for Eastman Kodak, for one example, testified that De Dietrich’s regional manager refused to discuss with him, because they are proprietary secrets, the thickness of the frit coatings, that is, the application of glass formula before its vitrification, and the exact number of firing cycles used by De Dietrich. Similarly, De Dietrich’s president *207 testified that the technique in firing the glass-lined vessels was a proprietary secret. Yet, according to plaintiffs witnesses, this is precisely the kind of proprietary information Wetzel acquired over his many years with Sybron and Pfaudler. Notwithstanding De Dietrich’s assertion that Wetzel is to follow De Dietrich practices exclusively, it is significant that Sybron vessels will make up a substantial portion of the equipment to be reglassed in New Jersey.
On his own testimony, Wetzel worked with the man in charge of ceramics, the one "with all the secret formulas”, on an almost daily basis. According to high Sybron employees, Wetzel sat in on weekly meetings where new processes were discussed, and the suggestions he offered to cure problems in the glassing and welding areas were frequently adopted. Significant too are Wetzel’s visits to the Mexican factory on behalf of Sybron, assertedly made because of his intimate knowledge of Sybron techniques. Also bearing on Wetzel’s knowledge of secrets is the contention that only a limited number of employees had knowledge of Sybron’s processes, and there was not unlimited access to the plant area in which Wetzel worked.
This is not to say, conclusively, that Wetzel possessed trade secrets. Defendants introduced testimony to establish that Wetzel had not acquired proprietary information. That he had no knowledge of glass formulas, that strangers had toured the Sybron plant, and that Wetzel’s value was assertedly his skill and judgment in supervising the processes are all relevant to the ultimate determination. The parties, moreover, would have undoubtedly offered additional evidence prior to final disposition of the merits. Indeed, counsel’s response to the hearing court’s curtailing of the evidence indicates that his full case had not been developed. A further complication is that, because trade secrets are involved, on a trial some of the proof would be received in camera, as suggested by plaintiffs counsel in the injunction hearing when he thought the cross-examination was intruding into delicate territory.
In short, with respect to the matter of trade secrets the issue was deliberately never fully explored on the preliminary motion, and no one then intended that it should be. It is enough that there was a showing of a sharply controverted issue of fact not resolvable by the Appellate Division by summary dismissal of the action.
Accordingly, the order of the Appellate Division, insofar as *208 it dismisses the complaint as to both defendants, should be reversed, with costs, and the action reinstated, and the order should otherwise be affirmed.