**777388 ONTARIO LIMITED and K.R. MOELLER ASSOCIATES, LTD.,**
Plaintiffs,

v.

**LENCORE ACOUSTICS CORP.,**
Jack Leonard and Jonathan
Leonard, Defendants,

Klaus Moeller, Nicklas Moeller, Therese Moeller, John Alberti, John Alberti, Inc., Steven Williams, William McCann, D. McCord Moody, Millennium Partners, Inc. and Archoustics LLC, Additional Counterclaim Defendants.

No. 99 CV 7953(ILG).

United States District Court,
E.D. New York.

May 4, 2001.

Jeffrey Golenbock, Elizabeth Jaffe, Esq., Golenbock, Eiseman, Assor & Bell, New York, NY, for 777388 Ontario Ltd., K.R. Moeller Associates Ltd.

David Frydman, Frydman & Bergman, New York, NY, Stephen Shore, Schwarzfeld, Ganfer & Shore, New York, NY, for Lencore Acoustics Corp., Jack Leonard, Jonathan Leonard.

David Frydman, Frydman & Bergman, New York, NY, for Klaus Moeller, Nicklas Moeller, Theresa Moeller, John L. Alberti, John Alberti Inc., Steven Williams, William McCann, D. McCord Moody, Millennium Partners, Inc., Archoustics LLC.

## MEMORANDUM and ORDER

GLASSER, District Judge.

The moving counterclaim defendants Teres[1] Moeller, William McCann, D. McCord Moody, Archoustics LLC, Millennium Partners, John Alberti, John Alberti, Inc. and Steven Williams have moved to dismiss the counterclaims pursuant to

---

1. Teres Moeller's name is misspelled as Therese Moeller in the case caption.

Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. For the reasons that follow, the counterclaim defendants' motion should be denied.

## Background

Plaintiff 777388 Ontario Limited ("777388") and K.R. Moeller Associates, Ltd. ("Moeller") (collectively "plaintiffs") filed this action against Lencore Acoustics Corp. ("Lencore"), Jack Leonard and Jonathan Leonard (collectively "defendants") in 1999. The Complaint asserts state law causes of action for unfair competition, and misappropriation of trade secrets, as well as Lanham Act claims of false advertising, trademark infringement against Lencore and the individual defendants, in addition to a state law breach of contract claim against Lencore alone.

In February 2000, prior to answering the Complaint, defendants moved to dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim and in the alternative for a more definite statement of the claims against them pursuant to 12(b)(e). In a Memorandum and Order dated May 25, 2000, this court denied both motions. While familiarity with that decision is presumed here, the Complaint alleges, in brief, that 777388 owns a trademark called "Scamp" and patents registered in Canada, the United States and Europe associated with a technology known as the Scamp Sounds Masking System ("Scamp system"). The Scamp system facilitates sound level control that may be used to reduce background noise in, for example, open office spaces. The technology is manufactured by Moeller under a license from 777388. Moeller has sold its sound-masking equipment in the United States through an exclusive distributorship agreement with Lencore since 1991. Moeller alleges that, beginning in 1995, Lencore devised a scheme to compete with and supplant the Scamp system in the U.S.

market. Moeller avers that in furtherance of this scheme, Lencore used engineering specifications and drawings of the Scamp system, which are alleged to be trade secrets, obtained a trademark for its line of sound-masking equipment (the "Spectra system") with the intent to confuse customers defendants had purported to cultivate on behalf of Moeller, and marketed some of its products as Lencore, rather than Scamp, products.

In July 2000, following the denial of their motion to dismiss, defendants answered the Complaint and served counterclaims on plaintiffs ("counterclaim defendants") and, in addition, seven individuals and three corporations that were not named as parties to the original action ("additional counterclaim defendants"). The additional counterclaim defendants are Klaus Moeller; Nicklas Moeller; Teres Moeller; John Alberti, John Alberti, Inc.; Steven Williams, William McCann, D. McCord Moody, Millennium Partners, Inc. and Archoustics LLC.

Defendants assert a claim of unfair competition against all counterclaim defendants, a breach of contract claim against Moeller, a fraud claim against Moeller and Teres Moeller, claims based on misappropriation of trade secrets and tortious interference with and breach of contract against Moeller, Klaus, Nicklas, and Teres Moeller, John Alberti, Steven Williams and John Alberti, Inc, an unjust enrichment claim against Moeller and a defamation claim against Moeller, Klaus and Nicklas Moeller, John Alberti, John Alberti, Inc., Steven Williams, William McCann, D. McCord Moody, Millennium Partners, Inc. and Archoustics LLC. No conspiracy claim is pleaded explicitly. The following factual allegations are derived from defendants' Answer and Counterclaims.

Defendants allege that in the 1970's, defendant Jack Leonard and his business

partner, Harold Goldstein, built and obtained a patent for the Scamp sound-masking system. Around that time, Jack Leonard met Klaus Moeller, who was then a Canadian consultant in open office plan design and unfamiliar with the relatively new technology of sound-masking. Defendants aver that Jack Leonard took Klaus Moeller under his wing and taught him about the design and manufacture of sound-masking equipment. Defendants further allege that Klaus Moeller's company, known as Moeller, and Jack Leonard's company entered into an exclusive distributorship in which Moeller distributed Scamp equipment in Canada. In 1981, however, because of high import tariffs, Klaus Moeller and Jack Leonard entered into another agreement which transferred the Scamp sound-masking technology to Moeller and authorized Moeller to manufacture Scamp equipment in Canada. Defendants allege that Jack Leonard's company stopped manufacturing Scamp equipment in 1989 and sold the patent that he and Goldstein had obtained in the 1970's to Moeller.

In 1990, Jack Leonard's son, Jonathan Leonard, who had previously worked with his father, formed Lencore. Lencore manufactured and sold noise suppression equipment, including acoustic wall paneling. Jonathan was subsequently joined by his father in this new company. Having known Klaus Moeller for over ten years, Jack Leonard turned to Moeller and attempted to negotiate an exclusive distribution agreement in which Lencore would sell Moeller equipment in the United States. Although an exclusive agreement was never consummated, defendants allege that Moeller did agree to fill Lencore purchase orders for Scamp equipment. Lencore eventually grew into a successful business that offers marketing, consulting, sales and installation of sound control products and services, including what de-

fendants term the "Lencore Sound Masking System." Defendants acknowledge that certain components in this system were supplied by Moeller, but they attribute Lencore's success to Jack Leonard's vision and experience in the industry. Defendants further allege that as Lencore was becoming increasingly successful, Moeller began to show an interest in negotiating an exclusive agreement but on terms that were unfavorable to Lencore, including a unilateral right to terminate the agreement after four years and a right to access Lencore's customer lists and distribution network. At the same time Lencore was purchasing Scamp equipment from Moeller, Klaus' son, Nicklas, joined Moeller and began to learn the sound-masking trade. In addition, Moeller began using a Canadian distributor to sell its equipment in the United States. As a result, defendants began to fear that Moeller was planning to terminate Lencore and sell and distribute Scamp equipment in the United States.

In 1995, Lencore began having problems with the Scamp equipment it was using in its sound-masking systems. Lencore alleges that it brought these problems to Moeller's attention but that Moeller refused to remedy them. Instead, Lencore was forced to redesign a circuit board on the Scamp unit. Defendants aver that Lencore shared its redesign with Moeller, which incorporated the redesign into its products but never paid Lencore for its work.

In view of Lencore's poor experiences with the Scamp product and Moeller's refusal to negotiate a distribution agreement, Lencore became increasingly concerned that Moeller was planning to take over Lencore's United States sales and, to preempt the effect of such a plan, Lencore decided to develop its own sound-masking equipment. Lencore called this line of

equipment the "Spectra system" and alleges that it has a re-engineered printed circuit board with completely original functionality, external design and labeling. In 1997, Lencore began limited manufacture and sales of Spectra equipment. Defendants allege that Lencore advised Moeller of its activities for the purpose of attempting, once again, to negotiate an exclusive distribution agreement. However, refusing to negotiate in good faith, Moeller instead embarked on a scheme designed to destroy Lencore's business. As part of that scheme, Moeller set out to raid Lencore's sales force, drive away its customers by asserting false claims of patent and trademark infringement, and destroy its reputation and good will by intimidating its personnel and refusing to fulfill purchase orders for Scamp equipment that Lencore was relying on to complete projects.

Defendants allege that this scheme began in October 1998 when Klaus Moeller tried to induce several Lencore sales representatives to join Moeller at a trade show in Chicago. Soon after the trade show, Moeller began to accuse Lencore of trademark infringement. To avoid conflict, defendants contend that Lencore met various demands made by Moeller, including a demand that Lencore change its marketing materials and website and provide Moeller with a list of Lencore sales representatives. In December 1998, defendants aver that Moeller called one of Lencore's top producing sales representatives in furtherance of its attempts to raid Lencore's sales personnel.

In March 1999, Marcia Reed, a Lencore employee, placed an order by telephone with Moeller for approximately 2000 Scamp units. The Lencore employee spoke with Teres Moeller. Teres Moeller confirmed the order on behalf of Moeller but, as Lencore discovered one week later, neither intended to fulfill the order nor actually fulfilled it.[2] As a result, Lencore was forced to cover the units at a cost of $150,000 and only after significant delay. By April 1999, Moeller not only refused to deliver the units it had sold to Lencore but refused to accept future orders from Lencore, allegedly because Lencore's payment had been late.

In December 1998, defendants allege that William McCann and D. McCord Moody formed Millennium Partners for the purpose of carrying out Moeller's scheme. Millennium Partners is a North Carolina corporation which distributed Moeller equipment. In June 1999, McCann phoned Lencore and stated that his company was interested in hiring Lencore to design and build sound-masking systems in its properties. At McCann's request, Lencore sent McCann marketing materials and also arranged for a Lencore sales representative to travel to North Carolina to give Millennium Partners a presentation about Lencore products. During the presentation, McCann took diligent notes and asked detailed questions about Lencore customers, installers, dealers and other sales partners. Defendants now allege that, had they known that Millennium was a Moeller distributor, they would not have divulged this sensitive information.

Two days after the presentation, defendants allege that McCann called one of Lencore's sales partners to solicit him to work with Millennium Partners and Moel-

---

**2.** Teres Moeller is alleged by defendants to reside in Canada and to be the vice-president, secretary and treasurer of Moeller. She is the wife of Klaus Moeller and mother of Nicklas Moeller. Although defendants have alleged that Teres is the 50% owner of Moeller, she has submitted a declaration in which she states that she is not a shareholder of Moeller and does not control the company. (Teres Decl. ¶ 4)

ler on a job installing sound-masking equipment and urged him not to work for Lencore because of its infringing sales. McCann and Moody allegedly called other Lencore trade partners and told them that they should terminate their working relationships with Lencore. In some cases, it is alleged that Millennium Partners actually stole jobs for which Lencore had been selected to install sound-masking equipment. In addition, it is alleged that, in September 1999, Millennium Partners and Moody formed Archoustics LLC, a North Carolina corporation, as an additional distributor of Scamp equipment. Defendants allege that, in early 2000, Millennium Partners began anonymously sending pleadings in this action to Lencore trading partners.

In early 1999, Klaus Moeller recruited John Alberti and Steven Williams, two former Lencore sales representatives, and John Alberti, Inc. (collectively, the "Alberti defendants"), to act as secret Moeller sales representatives. At the time, the Alberti defendants were Lencore's Southern California sales representatives pursuant to an agreement executed in January 1999. The sales agreement allegedly required 60 days notice before termination by Alberti, Inc. Defendants aver that Alberti and Williams, under the pretense of this sales agreement but while actually working in secret for Moeller, attended Lencore meetings, including a sales meeting at a trade show in Chicago in June, 1999. During the meeting, Alberti learned confidential and proprietary information concerning Lencore, which they then shared with Moeller. By mid–1999, the Alberti, Inc.'s sales of Lencore equipment ground to a halt.

In October 1999, while at a trade show in Los Angeles. Klaus Moeller approached three Lencore representatives and falsely stated to them that Lencore was infringing Moeller's patent. Alberti and Williams made similar statements at the trade show. Soon after, the Alberti defendants terminated their sales representative agreement with Lencore without the sixty days notice allegedly required by the agreement. Six days after their termination, Alberti, Inc., allegedly under the direction of Klaus Moeller, began to do business as Archoustics West, a sales representative for Moeller. In addition, defendants allege that Nicklas Moeller and the Alberti defendants telephoned various other Lencore sales representatives, customers and dealers, falsely stating that Lencore was selling Moeller equipment, and offered several of those sales representatives jobs with Moeller.

With the exception of Klaus and Nicklas Moeller, all of the counterclaim defendants—that is, Teres Moeller, William McCann, D. McCord Moody, Archoustics LLC, Millennium Partners, John Alberti, John Alberti, Inc. and Steven Williams— have now moved for dismissal of the counterclaims on the basis of lack of personal jurisdiction. Moving counterclaim defendants argue that personal jurisdiction over Teres Moeller is lacking because the only New York contact alleged by defendants is a phone call Teres accepted from Marcia Reed of Lencore, in which Teres [3] allegedly misled Ms. Reed into believing that Moeller would fulfill Lencore's purchase order of 2000 pieces of Scamp equipment. Similarly they argue that personal jurisdic-

3. In her declaration, Teres Moeller states that she has visited New York only twice and that neither visit had any connection to the matters at issue in this lawsuit. (Teres Decl. 8) However, Teres acknowledges that during one of these visits, in February 1995, she and her husband had lunch with Jack Leonard, with whom her husband had been doing business, and that, after lunch, they went to Jack Leonard's office, where the two men had a business discussion that lasted several hours but in which she did not participate.

tion over the Millennium counterclaim defendants is lacking because Millennium Partners has no business dealings in New York and that the only New York contact alleged by defendants on the part of Millennium Partners is a phone call from William McCann to Lencore in June 1999 in which McCann represented that Millennium Partners was interested in hiring Lencore. In addition, they argue that neither McCann nor D. McCord Moody is subject to this court's jurisdiction because neither transacts business in or with persons or entities located in New York on behalf of Millennium Partners or Archoustics LLC. They claim that the only two New York contacts alleged by defendants are: (i) McCann's phone call to Lencore and (ii) Moody's communication with several unspecified Lencore sales partners, customers and dealers. As for Archoustics, moving counterclaim defendants argue that most of the conduct alleged by defendants occurred before the formation of Archoustics and had nothing to do with New York and that the company's only New York business involves its installation of a Scamp sound-masking system for Reuters Information Services in Long Island.

Like the other moving counterclaim defendants, the Alberti counterclaim defendants also maintain that this court lacks personal jurisdiction over them. As for John Alberti and Steven Williams—the President and Vice President of John Alberti, Inc.—they deny conducting business in New York and claim that the only actions alleged on their part occurred outside New York. The Alberti counterclaim defendants acknowledge, however, that John Alberti, Inc. had a business relationship with .Lencore, though they claim that this relationship was formalized in a letter agreement that was negotiated exclusively in California with Lencore's West Coast distributor, that it was executed in California and that it contemplated the sale of Scamp equipment in California only. The Alberti counterclaim defendants also acknowledge that John Alberti, Inc. had telephone contact with Lencore in New York, but that this contact was limited.

## Discussion

### I. The 12(b)(2) Standard

Personal jurisdiction of a federal court over a non-domiciliary is determined by the law in which the federal court sits. *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 222–25 (2d Cir.1963). Under New York law, the Court must follow a two-step procedure in order to determine whether there is personal jurisdiction over a defendant: (1) the Court must determine whether New York Civil Practice Law and Rule ("C.P.L.R.") §§ 301 or 302 provide a basis for personal jurisdiction, and (2) if they do, the Court must then conduct a constitutional inquiry to determine whether the exercise of personal jurisdiction over the defendant would offend due process pursuant to *International Shoe Company v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. *See A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 82 (2d Cir.1993); *En Vogue v. UK Optical,* 843 F.Supp. 838, 842 (E.D.N.Y.1994). The burden of establishing jurisdiction rests on the party asserting it. *See, e.g., Spectra Prods., Inc. v. Indian River Citrus Specialties, Inc.,* 144 A.D.2d 832, 833, 534 N.Y.S.2d 570, 571 (3d Dep't 1988); *Cato Show Printing Co., Inc. v. Lee,* 84 A.D.2d 947, 446 N.Y.S.2d 710, 712 (4th Dep't 1981).

Section 301 provides for general jurisdiction over a non-domiciliary defendant where that defendant is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of [its] presence in this jurisdiction." *Beacon Enter., Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983) (quoting *Simonson v.*

*Int'l Bank,* 14 N.Y.2d 281, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427 (1964)). "The non-domiciliary must be doing business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Id.* Here, there is no allegation that the counterclaim defendants "do business" in New York. Thus, § 301 confers no general jurisdiction over these defendants.

A plaintiff, however, may also invoke New York's long-arm statute, set forth in C.P.L.R. § 302, to assert specific jurisdiction over a defendant. Section 302(a) provides in relevant part:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state . . . if he
>
> > (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> >
> > (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
>
> 4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).

■ In order to defeat a motion to dismiss on the basis of lack of personal jurisdiction, a plaintiff in New York need only make a *prima facie* showing of jurisdiction. *See, e.g., En Vogue,* 843 F.Supp. at 842 ("If the Court relies on the pleadings and affidavits alone, the plaintiff need only make a *prima facie* showing of jurisdiction in order to defeat the motion to dismiss."); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999) ("Where a court [has chosen] not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a *prima facie* showing of jurisdiction through its own affidavits and supporting materials.") (internal quotation marks omitted). The pleadings and affidavits are construed in the light most favorable to the plaintiff, and all doubts are resolved in its favor. *Id.* (citing *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986)). Moreover, pursuant to Fed.R.Civ.P. 8(a)(1), a pleading need only contain a short and plain statement of the grounds upon which the court's jurisdiction depends. *Id.*

■ Section 302(a) provides that a court may exercise jurisdiction over a non-domiciliary who "in person or through an agent" performs jurisdictional acts. *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 199, 522 N.E.2d 40 (1988). Here, counterclaim plaintiffs have met their burden with respect to Teres Moeller, as they have alleged that she is one of three officers of Moeller and a fifty percent shareholder and would therefore be chargeable with Moeller's acts. Similarly, with respect to McCann and Moody, who are alleged to jointly own and direct Millennium Partners and Archoustics LLC, counter-claim plaintiffs have made a *prima facie* showing that Millennium Partners and Archoustics had an agency relationship with one another and with McCann and Moody. In addi-

**318**

tion, counter-claim plaintiffs have alleged that Moeller had an agency relationship with Millennium Partners and Archoustics LLC in that Millennium is alleged to have sold sound-masking equipment and provided related consulting services in New York at Moeller's direction. Finally, with respect to Steven Williams and John Alberti, counter-claim plaintiffs have met their burden by alleging that Alberti, Inc. acted as the agent of Steven Williams and John Alberti for jurisdictional purposes.

■ In addition to recognizing a simple agency theory, courts have defined "agent" broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators. *Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F.Supp. 798, 806–7 (S.D.N.Y.1975), *aff'd*, 527 F.2d 87 (2d Cir.1975). Counter-claim plaintiffs here have not specifically pleaded a cause of action that bears the title "conspiracy," but the factual background section of the Answer and Counterclaims states that counterclaim defendants:

> joined in a common scheme and plan to: (a) raid Lencore's key sales people and steal them away to work for Moeller, (b) drive away Lencore's customers and the remainder of its sales and distribution channels by stating that Lencore had

engaged in patent infringement, trademark infringement and other wrongful conduct and (c) destroy Lencore's business and good will by intimidating its personnel and refusing to ship Scamp product to Lencore so it could not fulfill customer orders (collectively, the "Moeller scheme").

(Answer & Countercl., ¶ 96) Moreover, the "scheme" described above is referred to throughout the remainder of the Answer and Counterclaims, including the section discussing the actual counterclaims, as are details of time and place and the alleged effect of this scheme. (*Id.* at ¶¶ 126–156) Thus, a question arises as to whether, despite the fact that no specific counterclaim specifically entitled "conspiracy" is pleaded, counterclaim plaintiffs may still resort to § 302(a) to establish jurisdiction. Because the cases interpreting § 302(a) hinge jurisdiction on whether facts are alleged which support such a claim, not on whether a particular cause of action bears the label "conspiracy," counterclaim plaintiffs' failure to specifically plead a cause of action for conspiracy will not, for jurisdictional purposes, preclude them from resorting to § 302(a), as long as they allege facts demonstrating the existence of a conspiracy which would put the counterclaim defendants on notice of the nature of the conspiracy.[4] Careful examination of the

---

4. The respective roles of Fed.R.Civ.P. 8 and 9 in pleading a conspiracy claim have been interpreted as follows:

> The general principles of "notice pleading" under Rule 8 apply to pleadings averring conspiracy. However, while Rule 8 demands only a "short and plain statement of the claim showing that the pleader is entitled to relief," in a pleading of conspiracy it is important that within the pleader's ability to do so, and without going into unnecessary detail, the opposing party be informed of the nature of the conspiracy charged, to which he may adequately plead.
> It is not enough merely to state that a conspiracy has taken place. Where possi-

ble, there should be some details of time and place and the alleged effect of the conspiracy. This is not to say that the pleader must plead his evidence; further details may be secured by means of discovery, and related devices. Moreover, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading.

*Kravetz v. Brukenfeld*, 591 F.Supp. 1383, 1387–88 (S.D.N.Y.1984) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice para. 8.17[5], at 8–180 through 8–183 (1984) and concluding that the "conspiracy claim in the instant complaint satisfies these rules [as it]

Answer and Counterclaims in this action reveals that they do allege such facts, and § 302(a) therefore should be available.

■■■■ "Acts committed in New York by a co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject that out-of-state defendant to jurisdiction in New York under § 302(a) of the CPLR." *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.,* No. 95 Civ. 7685, 1996 WL 437907 at *6 (S.D.N.Y. Aug.2, 1996) (citing *Lehigh Valley Industries, Inc., v. Birenbaum,* 527 F.2d 87, 93–94 (2d Cir. 1975); *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260 (S.D.N.Y. 1991); *Singer v. Bell,* 585 F.Supp. 300, 302 (S.D.N.Y.1984)). Nevertheless, "the bland assertion of a conspiracy or agency . . . is insufficient to establish jurisdiction." *Id.* (citing *Lehigh Valley Industries, Inc.,* 527 F.2d at 93–94; *Singer,* 585 F.Supp. at 303). Rather, "to establish jurisdiction on the basis of an alleged conspiracy, plaintiffs must allege facts demonstrating *prima facie* conspiracy, and must allege facts warranting the inference that the defendants were members of the conspiracy." *Id.* (citing *Singer,* 585 F.Supp. at 303; *Dixon v. Mack,* 507 F.Supp. 345, 348 (S.D.N.Y.

1980)). "To establish jurisdiction on this basis, a plaintiff, must clear two hurdles: (1) it must make a *prima facie* factual showing of a conspiracy; and (2) it must allege specific facts warranting the inference that the defendant was a member of the conspiracy." *Id.* at 1266 (citing *Singer,* 585 F.Supp. at 303; *Dixon,* 507 F.Supp. at 348). "To plead a valid cause of action for conspiracy, a plaintiff in New York must allege the primary tort[5] and four elements: (a) a corrupt agreement between two or more persons; (b) an overt act in furtherance of the agreement; (c) the parties' intentional participation in the furtherance of a plan or purpose; and (d) the resulting damage or injury." *Id.* at 1267 (citing *Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986)). To allege facts warranting the inference that the defendant was a member of the conspiracy, a plaintiff may show that: "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control,' or 'at the request of or on behalf

---

alleges that defendants . . . entered into a conspiracy pursuant to which they intended to improperly withdraw money from [plaintiff]'s account[;] alleges the manner in which the conspiracy was to be carried out and the role of the defendants. Although [plaintiff] has not indicated the exact times and places, he has alleged details of the conspiracy sufficiently particular to permit the defendants to respond.").

As for Fed.R.Civ.P. 9, its role in conspiracy claims has been described as follows: Rule 9(b) does not work to penalize a plaintiff merely because he was not privy to, and, therefore, cannot plead the details of, the inner workings of a group of defendants who allegedly acted in concert to defraud him . . . . On the other hand, the allegations supporting a claim of a conspiracy to defraud must be particular enough to give the

defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests."
*Id.* at 1388 (internal citations omitted).

**5.** "It is well established that civil conspiracy is not an independent tort under New York law. . . . The charge of conspiracy is merely the string which serves to connect defendants to the actionable wrong and the overt acts which caused injury." *Chrysler Capital Corp.,* 778 F.Supp. at 1267 n. 8 (citing *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir. 1981), *ABKCO Industries, Inc. v. Lennon,* 52 A.D.2d 435, 384 N.Y.S.2d 781, 783 (1st Dep't 1976), *Kajtazi v. Kajtazi,* 488 F.Supp. 15, 21 (E.D.N.Y.1978) (citing *Rutkin v. Reinfeld,* 229 F.2d 248, 252 (2d Cir.1956), *cert. denied sub nom. Kaplow v. Reinfeld,* 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956))).

of the out-of-state defendant." *Id.* at 1268–69 (internal citations omitted).

Counterclaim plaintiffs here have met their burden of alleging facts which would support a conspiracy by alleging, first, that counterclaim defendants entered into a common plan and scheme to raid and destroy Lencore by stealing its proprietary information and sales representatives. Second, counterclaim plaintiffs have alleged multiple overt acts in furtherance of the agreement, including Moeller's refusal to ship Scamp equipment to Lencore and its furnishing of sound-masking equipment to Reuters on Long Island, Millennium Partners' usurpation of proprietary information, Alberti defendants' termination of their sales representative agreement with Lencore and the formation of various business entities for the purpose of supplanting Lencore's hold on the United States market for sound-masking equipment. Third, counterclaim plaintiffs have alleged facts suggesting that each counterclaim defendant knowingly entered into and participated in a conspiracy to destroy Lencore. Fourth, counterclaim plaintiffs have alleged that Lencore suffered serious harm to its business, including loss of customers, sales representatives and cover costs. In addition to alleging facts that would meet the four elements of a conspiracy claim, counterclaim plaintiffs also have alleged specific facts warranting the inference, at this stage, that counterclaim defendants were members of a conspiracy, including the active recruitment of Lencore sales personnel by counterclaim defendants and their common motivation of eliminating Lencore as a competitor in the distribution and sale of sound-masking equipment in the United States.

In addition to making a *prima facie* showing of a conspiracy, counterclaim plaintiffs have also pleaded facts warranting the inference that each counterclaim defendant belonged to the conspiracy. Counterclaim defendants, it is alleged, knowingly stole Lencore's sales personnel, technology and market for sound-masking equipment and marketed and sold a competing product for their benefit themselves and Moeller and at the direction of Moeller.

Counterclaim plaintiffs argue that this court may exercise jurisdiction over counterclaim defendants under C.P.L.R. §§ 302(a)(1), 302(a)(2) and 302(a)(3). Each of these arguments is examined in turn.

## II. Section 302(a)(1)

C.P.L.R. § 302(a)(1) permits a court New York to exercise personal jurisdiction over a nondomiciliary "if two conditions are met: first, the nondomiciliary must 'transact business' within the state; second, the claim against the nondomiciliary must arise out of that business activity. A nondomiciliary 'transacts business' under CPLR 302(a)(1) when he 'purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.'" *Slapshot Beverage Co. v. Southern Packaging Machinery, Inc.*, 980 F.Supp. 684, 686 (E.D.N.Y.1997) (citing *CutCo*, 806 F.2d at 365 (citations and quotations omitted)). "No single event or contact connecting the defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *Id.* (citing *Sterling National Bank and Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870, 873–74 (2d Cir.1975); *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 457 n. 5, 261 N.Y.S.2d 8, 209 N.E.2d 68, *cert. denied*, 382 U.S. 905, 86 S.Ct. 241 (1965)).

Here, Teres Moeller is alleged to have transacted business in New York when she

negotiated a distribution agreement, albeit one which never was consummated, with Lencore in its New York offices in February 1995. Although the scheme alleged by counterclaim plaintiffs did not begin until 1998, three years later, that scheme is alleged to have begun in part because of the parties' failed negotiations and therefore is the basis for the counterclaims against her. Teres Moeller also is alleged to have transacted business in New York when she promised a Lencore employee in March 1999 that Moeller would fulfill an order for Scamp sound-masking equipment. Moving counterclaim defendants argue that jurisdiction cannot be predicated on this event because Lencore has not and cannot show that Teres had the requisite control over Moeller's transaction of business in New York. However, their admission that Teres is a Moeller officer combined with their failure to deny that she agreed to fulfill Lencore's order, is convincing evidence that she did in fact possess the requisite control over Moeller's business affairs to subject her to jurisdiction in New York on the basis of Moeller's business dealings with Lencore.

▇ Similarly, the Millennium counterclaim defendants transacted business in New York when Millennium Partners initiated discussions with Lencore in which they proposed to hire Lencore to install sound-masking equipment in its properties. Although the presentation Millennium Partners requested never led to a sales representation agreement, Millennium also has acknowledged that it has a sound-masking installation project in Long Island in which Moeller has provided both equipment and guidance. Millennium counterclaim defendants contend that jurisdiction is unavailable because the counterclaims asserted against them do not arise out of the Long Island project. However, Lencore argues, persuasively, that Millenni-

um's performance of the Reuters work is the direct result of Millennium's agreement with Moeller to drive Lencore out of business and the counterclaim, therefore, can fairly be characterized as arising from this activity. As for Archoustics LLC, that company allegedly was created by McCann and Moody at the direction of Moeller for the purpose of profiting from the trade secrets they had stolen from Lencore. To the extent Archoustics was born from the alleged unlawful activity of Millennium Partners, its role in the conspiracy cannot be severed for jurisdictional purposes from that of Millennium Partners.

▇ Finally, Alberti defendants undeniably transacted business in New York when they entered into a sales representation agreement with Lencore, a New York company, to sell its sound-masking equipment in California. While Alberti counterclaim defendants take issue with Lencore's characterization that the agreement was negotiated from New York, they admit to frequent telephone calls and facsimile transmissions in connection with that agreement and thus it cannot be said that they do not conduct business in New York.

Accordingly, jurisdiction over all moving counterclaim defendants is available under C.P.L.R. § 302(a)(1).

## III. Section 302(a)(2)

Pursuant to its express language, § 302(a)(2) is triggered only where a non-domiciliary commits a tort *within* New York. Here, Lencore argues in its opposition papers that for jurisdictional purposes, where the tort is fraudulent misrepresentation, the place of the wrong is where the plaintiff suffered injury, not where the misrepresentation was made, and that, here, the alleged fraudulent statements of counterclaim defendants are presumed to have been made in New York

because that is where Lencore suffered injury. (Mem. in Opp. 16) Lencore relies on this court's decision in *Sun Hill Industries, Inc. v. Holiday Trims, Inc.*, No. CV–91–1765, 1991 WL 307253 (E.D.N.Y. Sept.13, 1991), a reliance which is misplaced. Plaintiff in *Sun Hill Industries* alleged patent and copyright infringements. Crucial to this court's holding in *Sun Hill Industries* that jurisdiction may lie where the passing off "occurs" was the fact that the product that was being passed off was sold in this district.

■ Here, without exception, all of the events relating to the allegedly tortious conduct of the moving counterclaim defendants are averred to have occurred outside New York. The Third Counterclaim (for fraudulent misrepresentation) alleges that Teres Moeller fraudulently stated in March 1999 that Moeller would accept Lencore's purchase order when it had already been decided that no orders from Lencore would be accepted. Lencore eventually had to cover the cost of the equipment that Moeller failed to provide, and there is no allegation linking the alleged misrepresentation to sales in New York. In fact, all of the activities that are alleged in connection with this claim are alleged to have occurred outside of New York. As such, the claim is subject to the well-settled principle that misrepresentations that are made by a non-domiciliary to a party in New York do not constitute torts committed *within* New York. *See, e.g., Kelly v. MD Buyline, Inc.*, 2 F.Supp.2d 420, 433 (S.D.N.Y.1998) ("Based on these allegations it could be argued that the alleged tort was committed in New York, in the sense that the fraud involved misleading plaintiff, and that the intended effect, and thus plaintiff's reliance, took place in New York. If so construed, plaintiff's allegations would trigger section 302(a)(2) of the CPLR, and permit asser-

tion of jurisdiction over [defendant] because that provision covers any tort committed within the state. New York case law has not developed in this direction, however, and instead the jurisdictional provision governing torts committed within the state has generally been construed as limited to acts committed while the defendant is physically present within the state.") (internal citations omitted); *Mije Assocs. v. Halliburton Services*, 552 F.Supp. 418, 420 n. 5 (S.D.N.Y.1982) ("[I]n our case—and in all the cases which illustrate what we believe to be the general rule—the alleged tort was 'completed' out-of-state and its financial consequences were felt in New York solely because 'the injured person resides or is domiciled there.'") (internal citations omitted).

Because the tortious conduct alleged by counterclaim plaintiffs was not committed in New York, personal jurisdiction under § 302(a)(2) is unavailable.

## IV. Section 302(a)(3)

Section 302(a)(3) provides for jurisdiction over a nondomiciliary who "commits a tortious act *without* the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]" C.P.L.R. § 302(a)(3) (emphasis added). Here, moving counterclaim defendants argue that this section cannot provide a basis for personal jurisdiction because the threshold requirement that there be a tortious act "causing injury" cannot be met since the only injury that Lencore alleges it has suffered is pecuniary loss. Moreover, they

allege that even if an "injury" occurred in New York, defendants cannot satisfy the requirement that the moving counterclaim defendants "expected" their acts to have consequences in New York. Both arguments are unsupported by the record as it has been developed thus far.

Moving counterclaim defendants rely on *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 433 (2d Cir.1971) and similar cases, for the proposition that the situs of the injury is not the location in which plaintiff suffered financial loss, but the place "where the critical events associated with the dispute took place." *See, e.g., Palace Exploration Co. v. Petroleum Devel. Co.*, 41 F.Supp.2d 427, 435 (S.D.N.Y.1998); *Kowalski–Schmidt v. CLS Mortg., Inc.*, 981 F.Supp. 105, 110 (E.D.N.Y.1997); *United Bank of Kuwait, PLC v. James Bridges Ltd.*, 766 F.Supp. 113, 116 (S.D.N.Y.1991); *Data Commun., Inc. v. Dirmeyer*, 514 F.Supp. 26, 30 (E.D.N.Y.1981).

Moving counterclaim defendants' attempt to apply *American Eutectic* here is misplaced. The Second Circuit, in a decision which found *American Eutectic* inapplicable, recently stated that "courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *Bank Brussels Lambert*, 171 F.3d at 791 (citing *Hermann v. Sharon Hosp., Inc.*, 135 A.D.2d 682, 683, 522 N.Y.S.2d 581 (2d Dep't 1987)). "This 'original event' is, however, generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Id.* (citing *Hermann v. Sharon Hospital, Inc.*, 135 A.D.2d 682, 522 N.Y.S.2d 581, 583 (2d Dep't 1987); *Fantis Foods, Inc. v. Standard Importing Co., Inc.*, 49 N.Y.2d 317, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980); *Kramer v. Hotel Los Monteros S.A.*, 57 A.D.2d 756, 757, 394 N.Y.S.2d 415 (1st Dep't 1977)). The court in *Bank Brussels Lambert* noted that "[i]n the case of fraud or breach of fiduciary duty committed in another state, the critical question is thus where the first effect of the tort was located that ultimately produced the final economic injury." *Id.* at 792 ("Although the alleged omissions in this case occurred in Puerto Rico, New York was the place where BBL first disbursed its funds to Arochem. BBL argues that it disbursed these funds only because it was unaware of the information that Chase Puerto Rico conveyed to Fiddler on January 17, 1990. It was also this disbursement that was the first step in the process that generated the ultimate economic loss to BBL.") (citing *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 900 (2d Cir.1980) ("One immediate and direct 'injury' Oki's alleged tortious misrepresentations caused to plaintiffs was the loss of the money paid by them for the diseased vines. That injury was immediately felt in New York where plaintiffs were domiciled and doing business, where they were located when they received the misrepresentations, and where the vines were to be shipped."); *Marine Midland Bank v. Keplinger & Assocs., Inc.*, 488 F.Supp. 699, 703 (S.D.N.Y.1980) ("Since all disbursements to ADDM or its creditors were made by MMB in New York, the situs of the injury was in New York."). *Cf. also Polish v. Threshold Technology, Inc.*, 72 Misc.2d 610, 340 N.Y.S.2d 354 (N.Y.Sup. 1972) (finding jurisdiction under § 302(a)(2) over defendant who sent letter containing affirmative misrepresentation into New York because plaintiff perused fraudulent letter in the state and parted with stock certificates there in reliance on the letter)).

■ Here, the first step in the process that caused the injury to counterclaim plaintiffs in New York was Klaus Moeller's attempt to induce a Lencore employee to come work for Moeller in October 1998 at a trade show in Chicago. This attempt was followed by Teres Moeller's alleged false representation that Moeller would furnish a large equipment order and also by the eventual formation of secret agreements with Lencore representatives, who obtained proprietary information concerning Lencore's distributors, clients, and technology and conveyed it to Moeller. Although the first event occurred outside New York, there is no doubt that its impact was felt by Lencore in New York. Lencore is based in New York and manufactures its sound-masking equipment in New York and, because of the alleged actions of moving counterclaim defendants, Lencore stood to lose not only its good will and customers in New York but also the sales representatives that were vital to the sale and distribution of its New York-manufactured equipment.

That *American Eutectic* does not foreclose jurisdiction under § 302(a)(3) here is also plain from the decision itself, which recognized that "[p]erhaps the case would be different if the discernible local impact of the commercial injury to plaintiffs were greater, *e.g., destruction of plaintiffs' business in New York...* " *American Eutectic,* 439 F.2d at 435 (emphasis added); *Bank Brussels Lambert,* 171 F.3d at 793 ("In *American Eutectic,* we examined a tort of unfair competition and held that the situs of injury was the place where the plaintiff lost business, which is a holding completely consistent with [*Sybron Corp. v. Wetzel,* 46 N.Y.2d 197, 205, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (1978)] and with our present analysis of § 302(a)(3). In fact, we noted in *American Eutectic* that there might even be injury in New York when a defendant's

loss of customers occurs outside the state, so long as 'the discernible local impact of the commercial injury to plaintiff' in New York is great enough. After we decided *American Eutectic,* the New York Court of Appeals also explicitly held that the situs-of-injury test applies to 'commercial torts[, even] ... where the locus of injury is not as readily identifiable as it is in torts causing [ordinary] physical harm.' *Sybron,* 46 N.Y.2d at 205, 413 N.Y.S.2d 127, 385 N.E.2d 1055. *American Eutectic* thus does nothing to bar application of the situs-of-injury test to commercial torts like the ones alleged in this case.") (internal citations omitted); *see also Sybron,* 46 N.Y.2d at 205, 413 N.Y.S.2d 127, 385 N.E.2d 1055 ("It has been said that remote injuries located in New York solely because of domicile or incorporation here do not satisfy CPLR 302 ... Plaintiff's case does not rest on so narrow a foundation nor does its case depend on whether unfair competition injures it in every State in which it does business. It is, however, critical that it is New York where plaintiff manufactures and relines glass-lined equipment and the alleged trade secrets were acquired, and the economic injury plaintiff seeks to avert stems from the threatened loss of important New York customers.") (internal citations omitted). Plainly, the alleged raiding of Lencore's customers and sales representatives and the extraction of trade secrets by fraudulent means threatened to destroy Lencore's reputation in New York and to divert potential customers, such as the Reuters client, away from Lencore.

Having found that the injury to Lencore occurred in New York, the court also finds that the foreseeability requirements of § 302(a)(3) are met, insofar as moving counterclaim defendants knew that their conduct would harm Lencore and its business relationships in New York and de-

rived substantial revenues from their prior business dealings with Lencore and their present dealings with Moeller. Thus, personal jurisdiction may be exercised over the moving counterclaim defendants pursuant to C.P.L.R. § 302(a)(3)(ii).

## V. Due Process

 To meet the demands of due process, a defendant's contacts with the forum state must be such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Melendez v. Professional Machine & Tool Company, Ltd.*, 190 A.D.2d 657, 593 N.Y.S.2d 258 (2d Dep't 1993) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Having found that the requirements of C.P.L.R. §§ 302(a) and 302(a)(3)(ii) are met, the court also finds that due process considerations are satisfied. *See, e.g., Cleopatra Kohlique v. New High Glass, Inc.*, 652 F.Supp. 1254, 1257 (E.D.N.Y.1987) ("[B]oth the Due Process Clause and the statutory requirement that defendant should reasonably expect New York consequences are satisfied ... It is not necessary that defendant foresee the specific event producing injury in New York; it is sufficient that the defendant foresee the possibility of forum consequences generally.") (citing *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980)).

## Conclusion

For the foregoing reasons, the motion by counterclaim defendants Teres Moeller, William McCann, D. McCord Moody, Archoustics LLC, Millennium Partners, John Alberti, John Alberti, Inc. and Steven Williams to dismiss the counterclaims on the basis of lack of personal jurisdiction pursuant to Fed. R. Civ. 12(b)(2) should be denied. Personal jurisdiction over each of the moving counterclaim defendants is available under C.P.L.R. §§ 302(a)(1) and 302(a)(3)(ii).

SO ORDERED.